Lucien Jules GUIDROZ,
Petitioner-Appellant,

v.

James A. LYNAUGH, Director, Texas Department of Corrections, and Jim Mattox, Attorney General of Texas, Respondents–Appellees.

No. 87–5503.

United States Court of Appeals,
Fifth Circuit.

Aug. 19, 1988.

Kathleen LaValle, Akin, Gump, Strauss, Hauer & Feld, Dallas, Tex., for petitioner-appellant.

C. Rex Hall, Jr., Asst. Atty. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for respondents-appellees.

Before THORNBERRY, WILLIAMS, and SMITH, Circuit Judges.

THORNBERRY, Circuit Judge:

In this habeas corpus case, the petitioner argues that improper jury argument denied him due process in his state criminal trial. The district court dismissed the petition. We reverse.

I.

The undisputed facts are that Lucien Jules Guidroz killed his wife on July 4, 1976 by stabbing her twenty-three times with a knife. His wife's two sons, who had been in a bedroom with the door closed during the attack, left the house through a window and then called the police. The police found Guidroz underneath two feet of garbage in a trash bin outside the apartment building in which he lived. Guidroz had slashed his wrists and was bleeding seriously. The police arrested him and he was charged with murder.

On September 2, 1976, a Texas state court declared Guidroz incompetent to stand trial. At a second hearing on November 3, 1977, he again was declared incompetent. After that hearing, Guidroz's attorney and a prosecutor signed a stipulation. The stipulation said that all evidence known to the state was to the effect that Guidroz was insane, as defined by Texas law, at the time of the offense. The stipulation also said that the report of Dr. James Grigson, which was not then available, confirmed that Guidroz was legally insane at the time of the offense.

On July 27, 1978, Guidroz was declared competent to stand trial. Trial began on August 29, 1978. Guidroz pleaded not guilty by reason of insanity. The defense called two experts, both of whom testified that Guidroz was insane at the time of the offense. The prosecution called no experts, but produced four lay witnesses who knew Guidroz and had seen him around the time of the offense. These witnesses testified that Guidroz appeared normal. In addition, despite the stipulation, the prosecutor was permitted over an objection to argue that the doctors' reports, including the report of Dr. Grigson, related only to Guidroz's competency to stand trial, not to insanity at the time of the offense.

The jury convicted Guidroz and assessed punishment at ninety-nine years in prison. The Texas Court of Appeals upheld the conviction over a dissent. *Guidroz v. State*, 679 S.W.2d 586 (Tex.App.—San Antonio 1984, pet. ref'd). The Court of Criminal Appeals, with one judge dissenting, refused discretionary review. The Court of Criminal Appeals also denied two state habeas petitions.

On October 1, 1984, Guidroz filed this pro se petition for a writ of habeas corpus. The sole ground for relief stated in the petition was the claim that Guidroz was insane at the time the offense was committed. But, Guidroz attached to his federal pro se petition a copy of an earlier state petition that set forth several other grounds for relief, including sufficiency of the evidence, violation by the prosecutor of the stipulation, and other prosecutorial misconduct. The district court referred the case to a magistrate, who filed findings recommending the denial of Guidroz's claims, including claims raised only in the attached state petition. The district court adopted the magistrate's report, thus denying Guidroz's petition.

## II.

We first must decide whether we may address Guidroz's contention that the prosecutor's closing argument improperly contradicted the stipulation and consequently denied him due process. The state asserts that Guidroz raised this contention for the first time on this appeal, and therefore that it is not properly before us.

In the original petition filed in federal district court, Guidroz employed a standard form provided to prisoners in state custody. The form recited some of the most common grounds for habeas petitions and contained space for prisoners to assert four grounds of error along with "supporting facts" for each. For ground one, Guidroz typed the words, "INSANE AT TIME OF OFFENSE." For supporting facts, Guidroz typed, "EXIBITS [sic] 1,2,3,4." Attached to Guidroz's petition as the exhibits were several documents concerning the proceedings in state court, including his state habeas petition and, significantly, his brief on appeal to the Texas Court of Criminal Appeals. The brief to the Court of Criminal Appeals had been prepared by an attorney and contained arguments on several grounds of error; in particular, it contained an extensive discussion of claimed improper argumentation by the prosecutor in violation of the stipulation.

At first, the district court apparently refused to consider the grounds for relief raised only in the attachments to Guidroz's petition. For example, in the court's order of November 26, 1985 denying the state's motion to dismiss for failure to exhaust state claims, the district court advised that "the only claims which are now before the court in support of [Guidroz's] habeas petition are his allegations of insanity at the time of the offense and the existence of new evidence." (Guidroz had raised the allegation of new evidence in a later pleading.) Later, however, the district court apparently changed its mind. On November 21, 1986, the magistrate issued Findings and Recommendations that disposed of two grounds for relief that were raised only in Guidroz's state habeas petition, incorporated by reference in his federal petition. The

magistrate justified considering these grounds of relief by citing the practice of federal courts to construe pro se habeas petitions "with the greatest liberality." *See Mays v. Balkcom*, 631 F.2d 48, 51 (5th Cir.1980); *McCloud v. Wainwright*, 508 F.2d 853 (5th Cir.1975). The district court in a December 18, 1985 order adopted the magistrate's report "in all respects."

■ We agree with the district court that pro se habeas corpus petitions must be construed liberally. *Mays*, 631 F.2d at 51; *McCloud*, 508 F.2d at 854 n. 2. As a result, we think that Guidroz's petition, accompanied by the brief to the Texas Court of Criminal Appeals, sufficed to raise before the district court the issue of improper prosecutorial argument. A habeas petition "need only set forth facts giving rise to the cause of action." *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 1497, 52 L.Ed.2d 72 (1977); *see Golden v. Newsome*, 755 F.2d 1478, 1480 n. 4 (11th Cir.1985) (holding that, while a habeas petition itself failed to raise explicitly a ground of error, "appellant's accompanying brief made the implicit issue an explicit one. It is well-settled that mere errors of pleading and other matters of form will not bar consideration of the *pro se* claims of federal habeas petitioners . . . ."); *Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir.1985) (per curiam) (holding that the requirement of liberal construction means "active interpretation in some cases to construe a pro se petition 'to encompass any allegation stating federal relief' " (quoting *White v. Wyrick*, 530 F.2d 818, 819 (8th Cir.1976)). Guidroz's petition, considered in its entirety, extensively discussed the facts underlying the claim of improper prosecutorial argument.

## III.

■ Guidroz argues that he was denied due process because the prosecutor made improper arguments that contradicted the stipulation. When, as here, a prisoner alleges a "generic" due process violation due to improper prosecutorial comments, a reviewing court must determine whether the remarks, "in the context of the entire trial, were sufficiently prejudicial to violate [de-

fendant's] due process rights." *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 1869, 40 L.Ed.2d 431 (1974). It is not enough that the remarks were "undesirable or even universally condemned"; a defendant may obtain relief only if "the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986) (quoting *Donnelly*, 94 S.Ct. at 1871). In this circuit, "[t]he test applied to determine whether a trial error makes a trial fundamentally unfair is whether there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Rogers v. Lynaugh*, 848 F.2d 606 (5th Cir.1988) (quoting *Kirkpatrick v. Blackburn*, 777 F.2d 272, 278–79 (5th Cir.1985) (per curiam)); *see also Edwards v. Scroggy*, 849 F.2d 204, 211 (5th Cir. 1988). Because we must evaluate any possible fundamental unfairness in the context of the entire proceedings, we must consider in detail the circumstances of the stipulation and the prosecutor's comments.

Charles Butts, Guidroz's defense counsel, and Bill Blagg, the prosecutor, signed the stipulation on November 3, 1977, immediately following a hearing at which Guidroz had been declared incompetent to stand trial.

### STIPULATION AS TO INSANITY AT TIME OF OFFENSE

It is stipulated by and between the State and defense counsel (defendant being unable to participate personally in this stipulation by reason of his present incompetence) that *all of the evidence known to the State and all doctors report that at the time of the offense herein, to-wit: on or about July 4, 1976, the defendant, LUCIEN JULES GUIDROZ, indicted as LUCIEN GUIDROZ, was legally insane* as that term is defined in Section 8.01 of the Texas Penal Code, in that immediately prior to such date and specifically on such date of July 4, 1976, and at the time of the offense set forth in the indictment herein, said defendant, as a result of mental disease and defect, was incapable of conforming his conduct to the requirements of the law that he is alleged to have violated in the indictment herein.

It is agreed that this stipulation may be entered into the record in connection with defendant's hearing on his competency to stand trial and that such stipulation and the reports of doctors and other testimony in such competency hearing this 3rd day of November, 1977, by the Honorable John G. Benavides, Judge Presiding, will be admissible in any and all future Court proceedings concerning this offense should there be any such further proceedings.

It is further agreed that the report from Dr. Grigson which has not yet been returned at the time of this hearing, may be and such is hereby incorporated into the record hereof and made admissible for all future purposes, *such report being to the effect and confirming that the defendant, LUCIEN GUIDROZ, was legally insane pursuant to Section 8.01, Texas Penal Code, on or about July 4, 1976, the date of the offense herein.*

(emphasis added).

At trial, Butts introduced into evidence both the stipulation and the doctors' reports that were attached to it. During the trial, however, it became clear that Blagg's view of the effect of the stipulation was quite different from Butts'.

First, during cross-examination of Dr. Richard Cameron, a psychiatrist and witness for the defense, Blagg said:

Let me just ask this question first. What I'm getting at is that you are leaving the impression that all of the doctors would agree with you that he was insane at the time he committed the offense. Now, unless you have talked with them personally about that issue, that would be a misimpression, would it not, because they have not filed their reports saying that?

At that point, Butts objected that Blagg was attempting to contradict the stipulation. Outside the presence of the jury, Butts noted that, unless a new doctor's report had been filed since the stipulation,

the stipulation said that "all doctors report" that Guidroz was insane at the time of the offense. Blagg argued in response that "not a single one of the doctors ever wrote a report concerning anything about sanity at the time of the commission of the offense. They merely stated that [Guidroz] was incompetent...." Blagg pointed out that the stipulation was in evidence, and argued that the issue of sanity was for the jury.

Second, during closing argument, Blagg again put forth the suggestion that the interpretation of the doctors' reports on the issue of sanity was a matter for the jury, despite the existence of the stipulation. For example, he said:

[The stipulation] is dated November 3rd, 1977, and I'm not trying to get out of it. I signed it, but don't you be fooled by what it says.

It says "It is stipulated by and between the State and the defense counsel ... That all of the evidence known to the State and all doctors' reports that at the time of the offense of July 4th 1976—" This was in November of 1977, and at that time that was just as true as it can be because the only report that had been filed was Dr. Cameron's report.

At that point, Butts objected because the other doctors' reports had been attached to the stipulation. In response to the objection, the court told the jury: "Well, Ladies and Gentlemen, the exhibit will contain the reports that are mentioned by counsel."

Blagg persisted in this line of argument. He told the jury that if it could find "any other doctors' reports that makes the blatant statement as early as right after he first examined him that the defendant was insane at the time of the offense, ... I'll ... eat it right here in this Court." Blagg said this despite the facts that the other doctors' reports were attached to the stipulation, and that the stipulation said that

"all doctors report" that Guidroz was insane.

Still more indicative of Blagg's view of the stipulation were his specific comments in reference to the report of Dr. Grigson. Blagg said to the jury: "You read [Dr. Grigson's] report. You read that report and you see if he says that man was insane at the time he committed the offense." Butts objected unsuccessfully. Blagg continued, noting that the stipulation said that Dr. Grigson's report had not yet been returned at the time of the stipulation: "Now folks, it is pretty hard to know what the doctor is going to do until the report gets here, isn't it? That is the report right there. There is no doubt about that. Now, you read it. You see if he said anything about the Defendant being legally insane at the time he committed the offense. I'm sorry. That is the stipulation." Butts again objected unsuccessfully.

■ In our view, the record shows that Blagg improperly and repeatedly argued that the jury should ignore the stipulation concerning the interpretation of the doctors' reports. The stipulation said that "all doctors report" Guidroz to have been insane at the time of the offense. Yet the court permitted Blagg to argue that the jury should find that the doctors' reports—which, except for Dr. Grigson's report, were attached to the stipulation when signed—concerned only incompetence to stand trial, not insanity. Furthermore, even though Dr. Grigson's report apparently was not yet "returned" at the time of the stipulation, the stipulation clearly says that the report was to the effect that Guidroz was insane at the time of the offense. Yet again, the court permitted Blagg, over Butts' objection, to argue for a different interpretation.[1]

We also think that the prosecutor's improper arguments prejudiced Guidroz's defense. The record shows that Butts pre-

---

1. The state argues that the interpretation of the stipulation was a matter of state law, and that on direct appeal the state courts held that the stipulation was properly enforced. *See Guidroz v. State*, 679 S.W.2d 586, 587–88 (Tex.App.—San Antonio 1984, pet. ref'd). We think this argument is misplaced. In this appeal, Guidroz asserts that the conduct of the trial denied him due process of law, not that the enforcement of the stipulation violated state law. Our resolution of the due process issue is not determined by the Texas courts' resolution of the state law issue.

pared the defense in the reasonable belief that the stipulation would prevent the prosecution from questioning the interpretation of the doctors' reports, and, in particular, Dr. Grigson's report. Because of the stipulation, Butts avoided the expense of calling the experts, including Dr. Grigson from Dallas, to testify at the trial. The experts therefore were not available to rebut the prosecutor's improper suggestions at trial that the doctors might not have found Guidroz to have been insane at the time of the offense.[2]

Finally, we think that the prosecutor's improper arguments, viewed in the context of the entire trial, deprived Guidroz of fundamental fairness. First, our review of the record disclosed other improper and highly prejudicial remarks by the prosecutor during closing argument. We do not hold that the other remarks, by themselves, justify reversal, but we think that the Supreme Court's command that we consider the "context of the entire trial" requires us to examine these other remarks as part of our determination of whether Guidroz was afforded fundamental fairness. *See Donnelly,* 94 S.Ct. at 1869; *see also Kirkpatrick v. Blackburn,* 777 F.2d 272, 281 (5th Cir. 1985) (per curiam) ("[P]rosecutorial comments are not considered in isolation, but are evaluated in the context of the entire trial as a whole including the prosecutor's entire closing argument.") Second, we are persuaded that the evidence of Guidroz's sanity presented at trial, though perhaps sufficient to sustain the verdict absent any other consideration, is nevertheless "so insubstantial that (in probability) but for the [improper prosecutorial] remarks no conviction would have occurred." *Kirkpatrick,* 777 F.2d at 281 (quoting *Fulford v. Maggio,* 692 F.2d 354, 359 (5th Cir.1982), *rev'd on other grounds,* 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983)).

 Near the end of closing argument, prosecutor Blagg told the jury:

Go ahead and study this evidence, and you think about it. I think you will find the man guilty and disregard, put aside this insanity defense as not being convinced. You should not be convinced based on the evidence, I submit to you. But if you do you've got to always flip the other side of the coin and see what happens if you do. Well, Mr. Guidroz can meet you sometime down here and brag about fooling this jury, brag about it, got away with it, just the type of person he is based on his background.

Now, I can assure you that you probably—when you finish deliberation and you find him not guilty he will be on the street just like that.

At that point, defense counsel objected to "hypothesizing on what this Court might do under the law in the event of an acquittal." The trial court instructed the jury to "concern yourselves with the guilt or innocence of the Defendant and only that," but denied a motion for a mistrial. Afterwards, however, Blagg returned to the same theme:

How long have the hospitals and the doctors had with Lucien? They have had a long time. They have had a long time. They haven't done a thing. They haven't done a thing. Now, it is society's chance to try to do the best they can, do something about Lucien Guidroz, his sociopathic personality blended in with drugs and possibly schizophrenia. How long do you think they will keep him if they got [sic] him back? Another 15 days before they put him on the streets.

Again, Butts objected and moved for a mistrial. The judge gave a similar instruction, and denied the motion for a mistrial. Again, however, Blagg, returned to the topic:

If you turn Mr. Guidroz away from this charge of murder and find him not guilty by reason of insanity, based on the evidence and the credible evidence in this case, the evidence shows that you are going to be turning loose a man who is

---

**2.** Dr. Grigson did testify at the state-court hearing on Guidroz's motion for a new trial. He said that he would have been willing to go to Bexar County to testify at Guidroz's trial, had he been called. He also stated his opinion that, based on his examination, Guidroz was insane at the time of the offense.

very dangerous. You are going to be aquitting [sic] him forever of the charge of murder in this case. There won't be any retrials of this case, and when you do that, if you do—and I hope you don't —based on the evidence, you might as well go ahead and give Mr. Guidroz these two knives back and let him go ahead and take them out with him, because that would be the effect of your verdict in a case like this.

Blagg's repeated and persistent suggestions to the jury concerning the effect of a verdict of not guilty by reason of insanity were improper. We emphasized the prejudicial nature of such comments in *United States v. Williams*, 523 F.2d 1203 (5th Cir. 1975). There, the prosecutor told the jury in closing argument that the defendant "wants to walk out of this courtroom" after a finding of not guilty by reason of insanity. *Id.* at 1208. We reversed the conviction in part because of this line of argumentation. "In the federal courts, a finding of not guilty by reason of insanity results in the release of the defendant from custody. Knowledge of this fact by the jury poses a significant impediment to a verdict based solely on evidence as to the defendant's mental responsibility." *Id.* at 1210; *see also Bruce v. Estelle*, 483 F.2d 1031, 1040 (5th Cir.1973) (stating that a prosecutor's comment to the jury that a finding of incompetency to stand trial would result in the defendant "walking the streets" was improper and "most probably infected the whole decision-making process of the jury"), *overruled on other grounds, Zapata v. Estelle*, 585 F.2d 750 (5th Cir. 1978); *cf.* Tex.Code Crim.P. art. 46.03 § 1(e) (as amended 1983) (prohibiting informing the jury of "the consequences to the defendant if a verdict of not guilty by reason of insanity is returned").

The prosecutor's comments in the present case were even more pernicious than those in *Williams*. First, the prosecutor's comments erroneously stated the law. Unlike federal law as described in *Williams*, Texas law provides that a find-

ing of not guilty by reason of insanity will *not* necessarily result in the defendant's release from custody.[3] In addition, while the trial court in *Williams* specifically instructed the jury to disregard the prosecutor's line of argument, 523 F.2d at 1208, the court in the present case gave merely a general instruction that the jury should concern itself only with the defendant's guilt or innocence. Again, we emphasize that it is not necessary to decide whether these comments, considered alone, warrant reversal. We consider them only as part of our determination of whether, in view of the entire record including the whole closing argument, the prosecutor's statements concerning the stipulation deprived appellant of fundamental fairness.

 Despite the improper comments by the prosecutor during closing argument, the errors would not assume constitutional dimension unless the evidence is "so insubstantial that (in probability) but for the remarks no conviction would have occurred." *Edwards v. Scroggy*, 849 F.2d 204, 211 (5th Cir. 1988) (quoting *Felde v. Blackburn*, 795 F.2d 400, 403 (5th Cir. 1986)). The evidence in the present case is weak enough that we think the improper remarks probably affected the verdict.

At trial, Guidroz's evidence of insanity comprised the testimony of two expert witnesses (the Bexar County Clinical Psychologist and a psychiatrist in private practice), the reports of several other experts, and the stipulation. Both testifying experts said that Guidroz was insane at the time of the offense, that Guidroz suffered from chronic paranoid schizophrenia, and that Guidroz had the delusion that he had to kill his wife to salvage her soul from hell. Cross-examination brought out some differences in the two experts' diagnoses. For example, the psychologist, Dr. Betty Schroeder, thought that Guidroz also was an antisocial personality, while the psychiatrist, Dr. Richard Cameron, did not. Also, both experts admitted on cross-examination

---

**3.** Tex.Code Crim.P. art. 46.03 § 4, though substantially changed in 1983, has always provided for the initiation of civil commitment proceed-

ings against individuals who are found not guilty by reason of insanity.

that psychology and psychiatry were not exact sciences, and that it was possible for them to be deceived by persons that they examined. Nevertheless, both firmly maintained that, in their judgment, Guidroz was insane at the time of the offense. In addition, the reports of the nontestifying experts introduced in evidence all said that Guidroz suffered from a mental disease. The report of Dr. Cameron said that Guidroz was probably insane at the time of the commission of the offense, and the report of Dr. Roger Burns, Ph.D., said that Guidroz "could have killed his wife as part of his delusional system." Of course, the stipulation signed by the prosecution on November 3, 1977 also said that "all of the evidence known to the State and all doctors report" that Guidroz was insane at the time of the commission of the offense.

The prosecution offered the testimony of no expert witnesses. Instead, it relied on nonexpert evidence from four persons who knew Guidroz. First, the victim's two sons by a previous marriage, Mike and David Mills, testified that they had never seen Guidroz exhibit any symptoms of an individual in a floridly psychotic state. For example, they had never noticed Guidroz to display a preoccupation with religion, even though both defense experts had testified that Guidroz had religious delusions. David Mills also testified that just before the murder, Guidroz's behavior, though perhaps "a little meaner" than usual, was otherwise unremarkable. Mrs. Mary Carolus, the wife of the victim's brother, testified among other things that Guidroz had bragged of deceiving the military into granting him a discharge based on mental illness. Finally, Mrs. Elizabeth Watson, an employee of Mrs. Carolus and the only nonrelative of the victim to testify for the state about Guidroz's sanity, also said that she had seen Guidroz shortly before the murder and that his behavior seemed normal.

In sum, the defendants introduced substantial expert testimony that Guidroz was insane at the time of the offense, while the prosecution introduced the testimony of four lay witnesses, three of whom were close relatives of the victim, that Guidroz did not appear insane and that he might have faked the symptoms of insanity to the doctors who examined him. Absent any other consideration, this quantum of evidence would perhaps be sufficient to sustain a jury verdict, in view of the Texas requirement that the defendant establish insanity by a preponderance of the evidence. See Guidroz v. State, 679 S.W.2d 586, 589 (Tex.App.—San Antonio 1984) (holding that "expert testimony, even if uncontradicted, does not establish insanity as a matter of law. Such unrebutted testimony only raises an issue of fact to be resolved by the trier of fact.") (citing Graham v. State, 566 S.W.2d 941, 949–50 (Tex. Crim.App.1978)). This court, however, must consider the evidence of Guidroz's insanity in the context of the prosecutor's improper arguments to the jury concerning the stipulation and the effect of returning a verdict of not guilty by reason of insanity. Considered in that context, we find the evidence wanting. We cannot say that, without these errors, the verdict would have been the same.

We emphasize the unusual nature of this case. The information in the record is that every mental health professional that examined Guidroz concluded that he suffered from a mental disease. In addition, every professional that expressed an opinion on the subject said that Guidroz was insane at the time of the offense. Moreover, at a time when most of the psychiatric examinations of Guidroz had been completed, the prosecution even stipulated that "all of the evidence" was to the effect that Guidroz was insane at the time of the offense. Despite these circumstances, the prosecution nevertheless chose to try Guidroz for murder. The only evidence of sanity it could produce, however, was the testimony of four lay witnesses—three of whom were relatives of the victim—to the effect that Guidroz had not appeared insane around the time of the murder. If the trial had been conducted properly, we would have confronted a difficult question of sufficiency of the evidence. As it happened, the trial was not only imperfect, but its very errors seem calculated to improperly influ-

ence the jury on the sole controversial issue. These facts draw us inexorably to the conclusion that Guidroz's trial so lacked fundamental fairness as to deny him due process of law. Our holding, of course, does not preclude a retrial conducted in a manner consistent with due process.

## IV.

For the above reasons, the judgment of the district court dismissing Lucien Guidroz's petition for habeas corpus is REVERSED. The cause is REMANDED to the district court for issuance of the writ.