Tonya Denise CLEMONS, Appellant,

v.

The STATE of Texas, State.

No. 2–02–220–CR.

Court of Appeals of Texas, Fort Worth.

March 25, 2004.

---

Robert Ford, Fort Worth, for Appellant.

Tim Curry, Crim. Dist. Atty., Charles M. Mallin, Chief Appellate Division, Edward L. Wilkinson, Mike Parrish, Jay Lapham, Asst. Dist. Attys., Fort Worth, for State.

PANEL A: CAYCE, C.J.; GARDNER and McCOY, JJ.

## OPINION

ANNE GARDNER, Justice.

Appellant Tonya Denise Clemons was tried by a jury for causing serious bodily injury to her six-year-old step-son T.G. by shooting him with a pistol in his back as he knelt to pray on October 17, 2001. During trial, Appellant pursued an insanity defense, which the jury ultimately rejected upon its determination that Appellant was guilty as charged in the indictment. The jury also made a deadly weapon finding and assessed her punishment at thirty years' confinement. Appellant raises one

issue on appeal, arguing that the trial court erred in overruling her timely objection to the State's improper jury argument concerning the effect of a verdict of not guilty by reason of insanity. We will affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

During trial, the State offered testimony that in 1998, Appellant met T.G., Sr. ("Sr."), and within eight months, Sr. and his two boys T.G. and ten-year-old T.G., Jr. ("Jr."), moved in with Appellant. According to Sr., Appellant was affectionate with the boys, who referred to her as "Mom." Eventually, Appellant and Sr. married and bought a house together, where they lived with the two boys. In October 2001, Appellant was working as a parole officer, and she earned extra money as a basketball referee.

Sr. also testified that, when he separated from T.J., who is the boys' biological mother, T.J. left the boys and saw them infrequently.[1] Sr. testified, however, that he did not get along well with T.J. and that she would call every three weeks or so at odd hours of the day or night. Sr. stated that Appellant often answered T.J.'s phone calls and became upset by them because she was not used to being talked to in the manner that T.J. used. Sr. testified that he recorded some of the calls and eventually asked the police to intervene to stop the harassing calls, but that he never followed up with the police after the police failed to reach him.

On October 15, 2001, T.J. called Sr. and asked what plans he and Appellant had made for T.G.'s seventh birthday, which was on October 26. Sr. testified that he and Appellant intended to have a sleepover party that day and that they had already sent out invitations to prospective guests. Within twenty minutes, T.J. called back, asking to have her son on the 20th, but Appellant told her that was not "in order." T.J. called back several more times that evening, and Sr. testified that he eventually took the phone off of the hook.

Sr. testified that later that evening, however, Appellant instructed the boys to call their mother. After T.G. had spoken with T.J., he told Appellant and Sr. that he wanted to spend his birthday, October 26, with T.J. During trial, Sr. stated that while he was upset and angry with this development, Appellant was "okay with it."

Jr. testified that, two days later, on the morning of Wednesday, October 17, 2001, he and T.G. were preparing for school as usual. Instead of taking the boys to school, however, Appellant took T.G. and Jr., to the woods of a city park, where she instructed them to kneel and pray. Jr. testified that, as T.G. knelt with his head bowed and his eyes closed, Appellant recited, "Heavenly Father," and then she shot T.G. in the back.

Jr. testified that he did not immediately react to the crack of the pistol as he too was on his knees in prayer, thinking it was a firecracker or something, but then his brother started screaming. At that point, Jr. stood up, turned around, and saw Appellant holding a gun in both hands. As he watched, Appellant then pointed the gun at Jr., and she pulled the trigger. The gun did not fire, and Jr. only heard a click. Appellant dropped the gun, picked up a rock, and hit Jr. in his temple with the rock. Jr. testified that he then "tussl[ed] around" with Appellant for five or six minutes, with Appellant choking him

---

1. Sr. admitted that he was not the biological father of T.G., but he testified that he felt like T.G. was his son.

at one point. Fortunately, Jr. was able to escape Appellant's grasp, run away from her, and flag down a passing car before she could hurt him further.

The State offered the testimony of Marcus Hall, the man who picked Jr. up in his car and drove him to safety. Both on the day of the attack and at trial, Hall identified Appellant as the person chasing after Jr. when he picked Jr. up. The State also offered testimony from police officers who were dispatched to the crime scene after Hall called 911, and they testified that they discovered T.G. lying on his back with his hands in the air and his eyes wide open. T.G. had a bullet wound in his back. While firefighters carried the child to a waiting ambulance, the police located Appellant's car at the scene and found a purse and wallet, which contained Appellant's driver's license and her employment badge. The police also found a short barreled .38 revolver, holding four bullets, one of which was attached to the casing, but which had been struck and was still under the firing pin. Deputy Michael Coursey testified that the bullet attached to the casing was consistent with a misfire.

When T.G. was brought to the hospital, he was in "extremely critical condition." Surgeons repaired his inferior vena cava, the largest vein in the abdomen, and they sewed up holes in his portal vein, stomach, and pancreas. A small portion of T.G.'s colon was removed, and T.G. endured a colostomy, which at the time of trial, the doctors intended to reverse but had not yet done so.

The State also offered evidence that Appellant had admitted to police and psychiatric experts that she had shot T.G. but that she had insisted that the shooting was accidental. As the State points out in its brief, while Appellant gave inconsistent stories, she consistently maintained that T.G. had been shot by mistake when she

fired the gun in an effort to scare Jr. after he saw the handgun in her waistband and charged her. Significantly, in her statement to the police, made within a few hours after she had committed the offense, Appellant admitted that she had planned to kneel both boys down and shoot them before Jr. rushed her. Appellant also admitted that she had stolen the handgun from her grandmother's house the night before the shooting, allegedly to protect herself from an attack by T.J.

As we discuss below, in support of her insanity defense, Appellant presented the testimony of two expert witnesses, Dr. Robert Cantu and Dr. Steven Karten. The State offered the testimony of expert witness Dr. Richard Coons, who opined that Appellant was not insane at the time she shot T.G. After hearing and considering all of the evidence and testimony presented, the jury found Appellant guilty of the offense of serious bodily injury to a child.

## II. JURY ARGUMENT

In her sole point on appeal, Appellant argues that the trial court erred in overruling her objection to the State's improper jury argument. Specifically, Appellant complains that the State, over her timely objection, improperly informed the jury of the consequences of reaching a verdict of not guilty by reason of insanity. See TEX.CODE CRIM. PROC. ANN. art. 46.03, § 1(e) (Vernon Supp.2004) ("The court, the attorney for the state, or the attorney for the defendant may not inform a juror or a prospective juror of the consequences to the defendant if a verdict of not guilty by reason of insanity is returned.").

In response to Appellant's closing argument urging the jury to find her not guilty by reason of insanity, the State argued:

You see, if you were to accept that defense, you're telling me here at the DA's

office, you're telling the police department, you're telling others, the general public, that insanity, that stress is a severe mental illness and defect. And if you just come in here and you say, I got a little stress, then we'll cut you loose, that—

Appellant objected on the basis that the State's argument was an "improper communication to the jury about matters in 46.03," but the trial court overruled her objection. We agree with Appellant that the complained-of argument was improper, but we also agree with the State that the trial court's overruling of her objection constituted harmless error.

■ To be permissible, the State's jury argument must fall within one of the following four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement. *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex.Crim.App.1992), *cert. denied*, 510 U.S. 829, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993); *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex.Crim.App.1973). The code of criminal procedure prohibits any discussion, including during closing argument, of the consequences of finding a defendant not guilty by reason of insanity. *See* Tex.Code Crim. Proc. Ann. art. 46.03, § 1(e); *Robison v. State*, 888 S.W.2d 473, 476 n. 3 (Tex.Crim.App.1994), *cert. denied*, 515 U.S. 1162, 115 S.Ct. 2617, 132 L.Ed.2d 859 (1995). Thus, the State's "we'll cut you loose" argument constituted improper jury argument under article 46.03, section 1(e), and the court erred in overruling Appellant's objection on that basis. *See* Tex.Code Crim. Proc. Ann. art. 46.03, § 1(e); *Robison*, 888 S.W.2d at 476 n. 3.

■ If a jury argument exceeds the bounds of proper argument, the trial court's erroneous overruling of a defendant's objection is not reversible error unless the error affected the appellant's substantial rights. Tex.R.App. P. 44.2(b); *Martinez v. State*, 17 S.W.3d 677, 692–93 (Tex.Crim.App.2000); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex.Crim.App.1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999). In determining whether the appellant's substantial rights were affected, we consider: (1) the severity of the misconduct (that is, the prejudicial effect of the prosecutor's remarks), (2) curative measures, and (3) the certainty of conviction absent the misconduct. *Martinez*, 17 S.W.3d at 692–93; *Mosley*, 983 S.W.2d at 259.

Appellant argues that the error affected her substantial rights because the argument focused the jury's attention on the outcome of a not guilty by reason of insanity finding, which is expressly prohibited by statute. We disagree. The State's argument was improper; however, the trial court's error in overruling Appellant's objection to the argument is not reversible. *See Rudd v. State*, 921 S.W.2d 370, 371 (Tex.App.-Texarkana 1996, pet. ref'd) (stating argument "if you play crazy, you may get to go to that door and walk out of this courtroom" only implicitly suggested that defendant would be "absolutely free in the community"); *see also Hashaw v. State*, No. 09–93–268 CR, 1995 WL 140827, at *7 (Tex.App.-Beaumont Mar.29, 1995, pet. ref'd) (not designated for publication) [2] (holding State's improper argument "[s]o, ... we will just turn this man loose, find him not guilty or not guilty by reason of insanity" could be construed as being a plea for law enforcement).

---

**2.** *See* Tex.R.App. P. 47.7 (providing that unpublished cases may be cited, although they have no precedential value).

Here, the State's argument directly challenged Appellant's assertion that she snapped and was insane at the time she shot T.G. in the back. The State argued that the jury should not equate life's stresses with insanity and encouraged the jury to reject Appellant's insanity defense. At that point, the State did not directly tell the jury of the effect of finding Appellant not guilty by reason of insanity. Instead, the State merely implied that if the jury accepted Appellant's insanity defense, then she would be allowed to go free. *See Rudd*, 921 S.W.2d at 371–72; *see also Hashaw*, 1995 WL 140827, at *7. Further, the State did not repeat the argument or emphasize the objectionable portion of its statement. *Compare Rudd*, 921 S.W.2d at 372 (stating that the improper comment was made briefly and only once and, therefore, was likely to have had little effect on the jury), *with Sanders v. Lynaugh*, 714 F.Supp. 834, 836–37 (W.D.Tex.1988) (stating, in a federal habeas proceeding, that the State's "cut loose argument" repeatedly and consistently suggested to the jury that the defendant would "walk the streets in complete freedom" if it accepted his insanity defense). We conclude that the severity of the State's misconduct was relatively small, given its context. *See Rudd*, 921 S.W.2d at 371–72; *see also Hashaw*, 1995 WL 140827, at *7.

In regard to the second factor, no curative measures were taken once the trial court overruled Appellant's objection. Concerning the third factor, as described in great detail above, the State offered overwhelming evidence of Appellant's guilt. Indeed, Appellant conceded in closing argument that "a verdict of not guilty is clearly not applicable to this case" and argued that "this case is about . . . insani-

ty." Because Appellant relied on the insanity defense, we must evaluate the evidence of Appellant's sanity or lack thereof to determine whether a conviction was certain in the absence of the State's misconduct.

On the issue of whether Appellant was insane at the time of the offense, Appellant offered the testimony of two expert witnesses, Dr. Robert Cantu and Dr. Steven Karten. Dr. Cantu, who is a practicing clinical and forensic psychiatrist, testified that, at the time of the offense, Appellant suffered a "brief psychotic disorder"[3] or a "brief reactive psychosis" as a result of an ongoing dysfunctional relationship with the boys' biological mother and a "stressor"— alleged harassment from the boys' biological mother—which was then triggered by an "acute stressor"—her step-son's decision to forego a birthday party she had planned so he could spend his birthday with his biological mother. Dr. Cantu opined that, because of a severe mental disease or defect, Appellant did not know that her conduct was wrong when she shot T.G.

On cross-examination, however, Dr. Cantu testified that he never asked Appellant "whether she knew her conduct was wrong at the time of the offense." Dr. Cantu also acknowledged on direct examination that, while he believed the evidence showed otherwise, it was "possible" Appellant had attempted to kill her step-sons simply "out of spite" against the boys' biological mother.

Appellant's other expert witness, Dr. Karten, a clinical psychologist, testified that Appellant lacked the resources "to handle extremely strong emotions like life-threatening kinds of emotions . . . [and]

---

**3.** Dr. Cantu also testified that a brief psychotic disorder could be characterized as "a very, very bad, horrible nervous breakdown."

very traumatic situations," and he concluded from his conversations with Appellant and after testing her that Appellant was delusional during the offense, despite her denial of suffering from hallucinatory experiences. Dr. Karten opined that when Appellant committed the offense, she was suffering a reactive psychosis triggered by the stress of having to deal with her stepsons' biological mother.

Dr. Karten acknowledged during cross-examination that, in reaching his conclusions, he had relied almost entirely upon what Appellant had told him and had not reviewed the police reports, witness statements, or even Appellant's own statement to the police. Dr. Karten also testified that he had asked Appellant about the specifics of the offense, and she told him she knew at the time of the offense it was wrong to shoot T.G.

In support of its position that Appellant was sane at the time she shot T.G., the State offered the testimony of Dr. Richard Coons, who is a non-practicing lawyer and a practicing psychiatrist. Dr. Coons testified that Appellant suffered from "an adjustment disorder with disturbance of conduct" as a result of difficulties with the boys and their biological mother, but he opined that her disorder did not constitute a severe mental disease or defect and that Appellant understood that it was wrong to shoot T.G. Rather, Dr. Coons stated that Appellant was frustrated and had difficulty dealing with things going on in her life and had a disorder of conduct—something he agreed that "[m]ost everybody" deals with in normal everyday life. Ultimately, Dr. Coons opined that:

> [Appellant] was sane at the time in that she did not have a severe mental disease or defect which prevented her from knowing that her conduct was wrong. And when you say knowing that your conduct is wrong, you mean know-

ing that it's wrong in many senses, including that it would be illegal.

And it's extremely difficult for me to believe that, given her rendition of the facts, given what happened, given the purposeful behavior, that a person who is a probation officer would not know that it's wrong to be killing children.

While the jury was presented with conflicting evidence regarding whether Appellant was insane at the time she shot her step-son T.G., the State presented the jury, as the trier of fact, with more than ample evidence to defeat Appellant's insanity defense. *See Bigby v. State,* 892 S.W.2d 864, 878 (Tex.Crim.App.1994) ("Ultimately the issue of insanity at the time of the offense excusing criminal responsibility lies in the province of the jury, not only as to the credibility of the witnesses and the weight of the evidence, but also as to the limits of the defense itself.") (citing *Graham v. State,* 566 S.W.2d 941, 952 (Tex. Crim.App.1978)), *cert. denied,* 515 U.S. 1162, 115 S.Ct. 2617, 132 L.Ed.2d 860 (1995); *cf. Guidroz v. Lynaugh,* 852 F.2d 832, 838–39 (5th Cir.1988) (holding, in a federal habeas proceeding, error surrounding State's improper argument regarding insanity verdict probably affected the verdict where the State's evidence was weak and the State stipulated, at one point, that "all of the evidence" demonstrated that the defendant was insane at the time of the offense).

In light of the nature and context of the improper argument and the abundance of evidence demonstrating that Appellant was not insane at the time she shot T.G., we hold that the trial court's error in overruling Appellant's objection did not affect Appellant's substantial rights; thus, the trial court's error is harmless. *See* TEX.R.APP. P. 44.2(b); *Martinez,* 17 S.W.3d at 692–93; *Mosley,* 983 S.W.2d at 259. Accordingly, we overrule Appellant's sole point.

### III. Conclusion

Having overruled Appellant's sole point, we affirm the trial court's judgment.