# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 13, 2011

No. 10-20019

Lyle W. Cayce
Clerk

RANDALL GONZALES,

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, HIGGINBOTHAM, and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Randall Gonzales was convicted by a Texas jury of a 1999 armed robbery. By all accounts the trial was hard-fought, with the battle line drawn between eyewitness identification and alibi. Failing to obtain relief on either direct or state habeas review, Gonzales filed this federal habeas petition arguing a denial of due process by failing to redact, from a warrant admitted into evidence, the arresting officer's affirmation of belief that Gonzales was the robber. The district court denied the petition but granted a certificate of appealability. We

No. 10-20019

cannot find that admitting this evidence rendered the trial fundamentally unfair in violation of the Due Process Clause. We affirm the judgment denying federal habeas relief.

I

On April 21, 1999, Officer Joe Garcia responded to a call reporting an armed robbery outside a hardware store. Arriving on the scene at 2:56 pm, he found the victim, Robert Pacini, who said that he had been robbed around 10 minutes earlier.[1] Pacini told Officer Garcia the robber was 5'6" or 5'7", about 140 to 150 pounds, clean shaven with a fair complexion, wearing jeans and a long-sleeved shirt, and took Pacini's watch, wallet, and three credit cards.

A week later, Pacini provided the numbers of his stolen credit cards to Detective Dennis Cook, who discovered that they had been used at several locations on the afternoon of the robbery. Personnel at most stores were unable to recall any information about the person using the cards, with the exception of Charles Hoffpauir, the clerk who handled a transaction at a General Nutrition Center store. According to his later testimony, Hoffpauir remembered the man using the cards because he purchased an unusual combination of products. Hoffpauir described the man as having a muscular build, between 5'9" and 6'0" tall, about 210 or 215 pounds, clean shaven with an olive complexion, and wearing blue jeans and a tight-fitting, short-sleeved tee shirt with "Dolce & Gabbana" written across the front. Detective Cook pulled the security tapes and developed photographs of people who had been in the mall the afternoon of the robbery. Hoffpauir did not recognize any of them.

---

[1] Pacini is a former reserve sheriff's deputy in the Harris County Sheriff's Office, which offered substantial assistance to the Houston Police Department during its investigation of this robbery.

2

No. 10-20019

On May 7—more than two weeks after the robbery—Pacini contacted Detective Cook to report that he saw his assailant outside a food market and had recorded the license plate number of a red moped the robber was riding. When Detective Cook read the final digit of the license plate number as "S" rather than "5," the number corresponded to a moped registered to Gonzales.

With this information, Detectives E.G. Steininger and H.L. Mar put together a photo spread of six people, including Gonzales. Hoffpauir and Pacini each made tentative identifications of Gonzales, but neither was 100% positive. Both believed they could identify the offender if they saw him in person. The detectives also returned to a Foley's Department Store where one of the credit cards was used, but clerks there did not recognize anyone in the photo spread.

After recording the tentative identifications, the officers obtained a probable cause warrant on June 17 and conducted a live line-up, which was videotaped. Gonzales was the only person from the photo line-up to also appear in the live line-up. Gonzales's attorney was present and arranged for Gonzales to swap shirts with another individual. Hoffpauir identified Gonzales at the line-up, stating that he was 90 percent certain. Pacini was not present for the live line-up, but viewed the videotape on June 23 and also identified Gonzales.

Detective Mar arrested Gonzales at the James Dee Beauty Salon, where he was employed. At the time of the arrest, the owner of the salon, Dee Hernandez, was reportedly belligerent toward the police and told Detective Mar that Gonzales could not have committed the robbery because he was working when it occurred. Another employee, Clare Gunn, also reported that Hernandez had been working the day of the robbery. Hernandez and Gunn were unable to produce supporting work records, but did provide a list of patrons and check-out times for that day.

One of the patrons, Diane Sloan, later testified that Gonzales was at the salon for most of her appointment, briefly leaving to pick up lunch but returning

3

before she left. Hernandez, the salon owner, testified that Gonzales brought back lunch before Sloan's appointment was over and that she had lunch with Gonzales right after Sloan left. Salon records show that Sloan checked out at 2:43 pm. By this timeline, Gonzales returned to the salon before the robbery took place.

The defense also challenged whether Gonzales fit the descriptions given by the prosecution's witness. Although both Pacini and Hoffpauir identified the robber as clean-shaven, both Sloan and another patron at the salon that day, Gaytha Arrendell, testified that Gonzales had large sideburns on April 21. Arrendell recalled thinking that Gonzales had been "trying to look like Elvis Presley." Co-worker Gunn also thought that Gonzales had sideburns that day, but admitted that she was not certain. Gonzales's roommate, Elaine Konran, produced a photograph showing Gonzales with sideburns on April 15, and she testified at trial that he still had them on April 21. The video line-up shows Gonzales with long sideburns on June 17.

Similarly, although Pacini initially told Officer Mar that the robber was wearing jeans and Hoffpauir gave matching testimony at trial, both Hernandez and Gunn testified they had never seen Gonzales wearing blue jeans in all the time they had known him. Gunn further testified that the salon dress code prohibited employees from wearing tee shirts or jeans except on Saturdays. At trial, Pacini changed his testimony and stated that the robber was wearing khakis, not blue jeans. Pacini's testimony that the robber wore a long-sleeved shirt also conflicted with Hoffpauir's testimony that the person using the stolen credit cards was wearing a short-sleeved tee shirt.

During cross-examination, Gonzales's lawyer asked Pacini, who described his assailant as weighing 140 to 150 pounds, whether the robber could have weighed as much as 210 or 215 pounds, as Hoffpauir had testified. Pacini answered, "No, sir. I don't think so." Gonzales was present in the courtroom

4

throughout both Pacini's and Hoffpauir's testimony; police records list him as 5'7" and 165 lbs.

The prosecution challenged the credibility of several of the alibi witnesses. Both Gunn and Hernandez admitted that Gonzales was a friend with whom they occasionally socialized outside of work, and Hernandez was confronted with inconsistent testimony she gave before the grand jury. Sloan testified at trial that she saw Gonzales fluffing another customer's hair when she left the salon, yet Hernandez testified that Gonzales had no appointments that afternoon and that they lunched together immediately after Sloan left. Sloan had difficulty recalling certain other details on cross-examination and was admonished by the trial judge for not answering the prosecutor's questions.

After deliberating for approximately half a day, the jury returned a guilty verdict. The court imposed a twenty-year prison sentence, which Gonzales is currently serving.

II

On direct appeal, the state court of appeals denied Gonzales's challenge to the sufficiency of the evidence, but concluded that the trial court erred by admitting an arrest warrant affidavit containing certain hearsay statements.[2] The warrant affidavit, written by Detective Mar, recounts identifying statements that Pacini and Hoffpauir each made to Detective Steininger upon viewing the photo spread.[3]   The affidavit also attests that, "[b]ased on the above information," Detective Mar "believes that the defendant . . . committed the

---

[2] *Gonzales v. State*, No. 14-00-00702-CR, 2002 WL 122867, at \*1 (Tex. Ct. App. Jan. 31, 2002).

[3] Because we must defer to a state court's authoritative construction of state law, we accept the state court's ruling that these statements were improperly admitted hearsay without independently examining whether they fall under Texas Rule of Evidence 801(e)(1)(C), which provides that certain statements of identification are "not hearsay."

offense of Aggravated Robbery." Because probable cause for the arrest was not disputed, these statements could only have been offered to prove the truth of the matter asserted, and thus were improper hearsay.[4]

The panel majority held that the wrongfully admitted evidence did not "ha[ve] a substantial and injurious effect or influence in determining the jury's verdict."[5] The majority noted that every declarant responsible for a statement in the warrant affidavit also testified at trial. Every fact asserted in the warrant affidavit was separately admitted through live testimony, save for the affidavit's concluding statement that Detective Mar believed the evidence showed Gonzales was guilty. Although a police officer's personal opinion of a defendant's guilt is not admissible, the state court concluded that this statement could not have had a substantial effect on the verdict, since the jury would have already inferred Detective Mar's opinion about Gonzales's guilt from the detective's decision to arrest Gonzales and from his testimony at trial.[6]

---

[4] *Gonzales*, 2002 WL 122867, at *1 (citing *Foster v. State*, 779 S.W.2d 845, 857–58 (Tex. Crim. App. 1989) (en banc), and *Ortiz v. State*, 999 S.W.2d 600, 607 (Tex. Ct. App. 1999)); *see also Haynes v. State*, 567 S.W.2d 518, 519–20 (Tex. Crim. App. 1978).

[5] *Gonzales*, 2002 WL 122867, at *2 (citing *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)).

[6] Justice Yates dissented, concluding that the warrant affidavit could have had a substantial impact in such a close case. In his view, the warrant affidavit served only to bolster the identifications by the State's witnesses, and the police officer's opinion of guilt could have been highly prejudicial in light of the conflicting evidence. *Id.* at *4. Although Justice Yates concurred in the court's holding that the State presented sufficient evidence to support a conviction, he did so "with grave reservations," *id.*, explaining that

[t]he state's case straddles a scale between weak and non-existent. There is no physical evidence against the appellant. . . . The descriptions of the assailant/customer given by the State's two witnesses were inconsistent with each other in key respects. . . . By contrast to the two state witnesses, the alibi witnesses for appellant and their descriptions were internally consistent, and demonstrably more accurate.

*Id.* at *5.

No. 10-20019

Gonzales subsequently filed a state habeas application arguing that admission of the warrant affidavit violated his federal due process rights and that he was denied effective assistance of counsel at trial. The trial court rejected Gonzales's due process challenge because it thought this claim had been raised and rejected on direct review. It also denied Gonzales's ineffective assistance claim. The Court of Criminal Appeals affirmed without written opinion. Gonzales then filed this federal habeas petition raising the same two claims. The district court denied both claims, but issued a certificate of appealability on the due process claim.

## III

Review of federal habeas claims is limited by the Antiterrorism and Effective Death Penalty Act of 1996.[7] AEDPA instructs that when a claim has been adjudicated on the merits in state court, habeas relief may not be granted unless the state-court adjudication "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts . . . ."[8] But if the state courts fail to adjudicate the petitioner's claim on the merits and the claim is not procedurally barred, no deference is owed to the state-court judgment and the federal courts must instead conduct a plenary review.[9] We review the district court's findings of fact for clear error and its conclusions of law *de novo*.[10]

---

[7] Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.

[8] 28 U.S.C. § 2254(d). *See generally Williams v. Taylor*, 529 U.S. 362, 402–13 (2000).

[9] *See, e.g.*, *Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir. 2003) (collecting cases).

[10] *Martinez v. Johnson*, 255 F.3d 229, 237 (5th Cir. 2001).

No. 10-20019

Gonzales must first show that his state-court proceedings involved a "violation of the Constitution or laws or treaties *of the United States*."[11]   He therefore cannot rely on the state-law hearsay violation as the basis for his federal habeas application.[12]  Instead, Gonzales argues that the admission of the warrant affidavit "'so infected the trial with unfairness as to make the resulting conviction a denial of due process,'"[13] in violation of the Fourteenth Amendment.[14]

We agree with Gonzales that the state courts never adjudicated his federal due process claim on the merits.  The state habeas court dismissed Gonzales's due process claim on the belief it had already been adjudicated on direct review. The direct appeal, however, had decided only a state-law evidentiary claim.[15]

_____

[11] 28 U.S.C. § 2254(a) (emphasis added).

[12] *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Pemberton v. Collins*, 1222–24 (5th Cir. 1993); *see also Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) (per curiam).

[13] *Darden v. Wainwright*, 477 U.S. 168, 180–81 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[14] Gonzales did not renew his sufficiency challenge in his federal habeas petition and did not obtain a certificate of appealability on this issue.  Our review therefore focuses only on the prejudicial effect of the specific evidence Gonzales challenges—the warrant affidavit—without addressing whether the evidence as a whole was sufficient for a rational jury to find guilt beyond a reasonable doubt.

[15] The decision on direct review did state that "[b]ecause no constitutional error is involved when hearsay is improperly admitted, we look to whether . . . . the [hearsay] error . . . had a substantial and injurious effect or influence in determining the jury's verdict." *Gonzales*, 2002 WL 122867, at *2 (internal citation omitted).  Viewed in context, it is evident this was not an adjudication of the due process claim Gonzales now presents.  This sentence explained that after finding a state-law hearsay violation, Texas courts apply the permissive *Kotteakos* harmless error standard, under which the verdict will stand unless the appellant shows the error had a "substantial and injurious" effect. *See King*, 953 S.W.2d at 271 (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  By contrast, when the appellant has shown a *constitutional* error, a state court on direct review must apply the more stringent *Chapman* harmless error standard, under which the verdict must be overturned unless the error is shown harmless beyond a reasonable doubt. *See Brecht*, 507 U.S. at 629–30, 636 (discussing *Chapman v. California*, 386 U.S. 18 (1967)); *see also Fry v. Pliler*, 551 U.S. 112,

(continued...)

8

No. 10-20019

The State does not appear to argue the issue.[16]  It follows that we will decide the due process claim without the deference to the state-court judgment commanded by AEDPA.[17]

IV

Due process is implicated only for rulings "of such a magnitude"[18] or "so egregious"[19] that they "render the trial fundamentally unfair."[20]  It offers no authority to federal habeas courts to review the mine run of evidentiary rulings of state trial courts.[21]  Relief will be warranted only when the challenged

---

[15] (...continued)
116 (2007).  While even a summary disposition is presumed to be a determination on the merits entitled to AEDPA deference, *Harrington v. Richter*, 131 S. Ct. 770, 783–85 (2011), "[t]he presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely," *id.* at 785.  In this case, the state court did not adjudicate Gonzales's due process claim, but rather explained it was applying the *Kotteakos* standard because it was unaware that any due process claim had even been raised.

[16] Rather than respond on the merits to Gonzales's argument that AEDPA deference does not apply, the State's brief asserts that this issue falls outside the scope of the certificate of appealability.  The State is mistaken: the district court issued a COA encompassing all "procedural or substantive rulings related to Petitioner's due process claim."

[17] *See, e.g.*, *Riley v. Cockrell*, 339 U.S. 308, 318 (5th Cir. 2003); *Henderson*, 333 F.3d at 600–01; *Jones v. Jones*, 163 F.3d 285, 299–300 (5th Cir. 1998).

[18] *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir. 1976).

[19] *Pemberton*, 991 F.2d at 1226.

[20] *Id.* at 1227.  A fundamentally unfair trial is one "largely robbed of dignity due a rational process." *Menzies v. Procunier*, 743 F.2d 281, 288 (5th Cir. 1984) (internal quotation marks omitted).

[21] *See Guidroz v. Lynaugh*, 852 F.2d 832, 834–35 (5th Cir. 1988); *see also Luna v. Beto*, 395 F.2d 35, 40 (5th Cir. 1968) (en banc) (Brown, C.J., concurring specially) ("[F]or an otherwise valid state conviction to be upset years later on federal habeas, surely something more than an evidentiary mistake must be shown.  If mistake is enough, then never, simply never, will the process of repeated, prolonged, postconviction review cease.").

evidence "played a crucial, critical, and highly significant role in the trial."[22]

The due process inquiry must consider the significance of the challenged evidence "in the context of the entire trial."[23] We have held that the Due Process Clause does not afford relief where the challenged evidence was not the principal focus at trial[24] and the errors were not "'so pronounced and persistent that it permeates the entire atmosphere of the trial.'"[25] This is a high hurdle, even without AEDPA's added level of deference.

By these measures, we must conclude that Gonzales's due process claim is without merit because the warrant affidavit was not at the heart of the case

---

[22] *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) (citing *Andrade v. McCotter*, 805 F.2d 1190, 1193 (5th Cir. 1986)).

[23] *Thomas v. Lynaugh*, 812 F.2d 225, 230–31 (5th Cir. 1987) (collecting cases); *accord Guidroz*, 852 F.2d at 834–35 (quoting *Donnelly*, 416 U.S. at 639).

[24] *See, e.g.*, *Cupit v. Whitley*, 28 F.3d 532, 537 (5th Cir. 1994) (hearsay evidence was not significant to the verdict because the defendant's "own statements given to law enforcement officers . . . . in conjunction with [his] *actions*, constituted the most devastating evidence against him"); *Pemberton*, 991 F.2d at 1227 ("In the face of a confession, the most probative and damaging evidence that can be admitted against a defendant, Pemberton's threats to the life of the victim, and other circumstantial evidence, the hearsay testimony elicited at trial was not crucial." (internal citation omitted)); *Corpus v. Estelle*, 571 F.2d 1378, 1381 (5th Cir. 1978) (admission of other-crimes evidence to prove identity in rape trial did not render the trial fundamentally unfair "because of the convincing testimony given by the victim herself"). *Cf. Snowden v. Singletary*, 135 F.3d 732, 737–39 (11th Cir. 1998) (where "the heart of the case" was testimony by three allegedly abused children, due process was violated by improper expert opinion that 99.5% of children tell the truth about sexual abuse).

[25] *Gordon v. Johnson*, 189 F.3d 468, at *2 (5th Cir. 1999) (unpublished) (quoting *United States v. Stewart*, 879 F.2d 1268, 1271 (5th Cir. 1989)). *Cf. Maurer v. Dep't of Corrs.*, 32 F.3d 1286, 1288–91 (8th Cir. 1994) (due process violated when prosecutor bolstered rape victim's testimony by asking four other witnesses whether she seemed sincere); *Cooper v. Sowders*, 837 F.2d 284, 286–88 (6th Cir. 1988) (due process violated by cumulative effect of trial judge's incorrectly stating that police officer was an expert witness, allowing the officer to give opinion on defendant's guilt, and allowing police informant to bolster credibility by discussing his testimony in past cases); *Menzies*, 743 F.2d at 288–289 (due process violated where numerous errors and prosecutorial misconduct "crippled the ability of Petitioner's lawyer to present an effective defense on his behalf"); *Walker v. Engle*, 703 F.2d 959, 963–69 (6th Cir. 1983) (due process violated by cumulative effect of six separate errors allowing admission of irrelevant and inflammatory evidence).

against him and the brief references to it at trial did not permeate the entire case. The affidavit came into evidence with the arrest warrant as the prosecution developed the path of Detective Mar's investigation. No part of the affidavit was ever read to the jury by the prosecution, nor relied upon by any witnesses. The prosecutor made only a passing reference to it in closing.

The heart of the case against Gonzales consisted of eyewitness identifications introduced through live testimony. Mention of these identifications in the warrant affidavit did not change the focus of the trial from the live testimony to the affidavit. Failure to redact the line in the affidavit stating that Defective Mar believes the defendant committed an offense hardly brings news to the jury. That the arresting officer thought he had his man is implicit in the prosecution. We are not persuaded that the statements made here in the warrant affidavit "were a crucial, critical, highly significant factor upon which the jury based its verdict of guilty."[26]

V

We today deny federal habeas relief. In doing so, we do not imply that the State's case at trial was overwhelming. It was not. Moreover, in our reading of this record and concluding that there was no denial of due process, we are well aware of the sometime frailty of eyewitness testimony, of which this case had its share. This is not a case where police identified a suspect based on physical evidence or other leads and only turned to eyewitnesses for confirmation.

Pacini's identification of Gonzales outside the food market requires acceptance of the coincidence that Pacini would happen across his assailant two weeks after the robbery in an unrelated location and notice the perpetrator in the crowd. Pacini's later identifications in the photo line-up and the video line-

---

[26] *Whittington v. Estelle*, 704 F.2d 1418, 1425 (5th Cir. 1983).

up are weakened by the circumstance that we cannot know whether they were based on his recollection of the robbery or on the image of the man he spotted at the food market two weeks later.

Hoffpauir did identify Gonzales in a photo line-up. But with only six photos in that line-up, there is a 16.7% probability that Hoffpauir picked the same person as Pacini by random chance.[27] Hoffpauir's later identification of Gonzales in the live line-up was weakened by the reality that Gonzales was the only person in the live line-up who also appeared in the photo line-up, presenting risk that Hoffpauir picked the one face that was familiar.

All of the witness identifications in this case were cross-racial identifications, which scientific studies have demonstrated to be particularly unreliable.[28] In all other respects, Pacini's and Hoffpauir's testimony were inconsistent with each other—in their descriptions of the robber's height, weight, and clothing—and with compelling evidence indicating that Gonzales was not clean-shaven and could not have been wearing street clothes on a work day.

The issue before us is whether the particular evidence Gonzales challenges in his habeas application—the warrant affidavit—rendered his trial fundamentally unfair. Gonzales argues that the conflicting testimony of eyewitnesses here leaves the State and defense in such equipoise that the high hurdle of due process is more easily cleared. The argument is not without power here. That said, and laying aside metaphors helpful in other contexts, we are

---

[27] Gary L. Wells et al., *Eyewitness Evidence: Improving Its Probative Value*, 7 PSYCHOL. SCI. PUB. INT. 45, 62 (2006). The investigators in this case did not conduct double-blind or sequential line-ups, which may increase reliability. *See id.* at 63–64; *see also* CAL. COMM'N ON THE FAIR ADMIN. OF JUSTICE, REPORT AND RECOMMENDATIONS REGARDING EYEWITNESS IDENTIFICATION PROCEDURES (2005), *available at* http://www.ccfaj.org/documents/reports/eyewitness/official/eyewitnessidrep.pdf.

[28] *See, e.g.*, Christian A. Meissner & John A. Brigham, *Thirty Years of Investigating the Own-Race Bias in Memory for Faces: A Meta-Analytic Review*, 7 PSYCHOL. PUB. POL'Y & L. 3 (2001).

No. 10-20019

persuaded that the bite of the challenged statements in the warrant affidavit is too small to render this trial fundamentally unfair. We agree with the district court that Gonzales has not established a due process violation.

AFFIRMED.