SUSAN M. CHEHARDY, Judge.
pMack A. Bradley appeals his conviction of one count of second degree murder. We affirm, for the reasons that follow.
STATEMENT OF THE CASE
On March 6, 2008, Mack A. Bradley was indicted by a Jefferson Parish grand jury for the second degree murder of Derrick Williams on May 3, 2006, a violation of La. R.S. 14:30.1. The defendant was arraigned on March 7, 2008, and pleaded not guilty. He filed various pre-trial motions, including motions to suppress identification, to suppress evidence, and to suppress confession, and a motion to quash, all of which were denied. The trial was held on March 23-25, 2011, and the twelve-member jury found the defendant guilty as charged.
The defendant filed a motion for new trial, which was denied on April 18, 2011. On that same date, the trial court sentenced the defendant to imprisonment at hard labor for life, without benefit of parole, probation, or suspension of sentence. The defendant now timely appeals his conviction.
FACTS
Dr. Karen Ross, á forensic pathologist with the Jefferson Parish Coroner’s Office, testified she performed the autopsy on Derrick Williams. Dr. Ross testified |3that the cause of Williams’ death was multiple gunshot wounds, numbering eight, and the manner of death was homicide.
Jeffery Rodrigue, a homicide detective with the Jefferson Parish Sheriffs Office, testified he was the case detective assigned to investigate the homicide of Derrick Williams. He testified that on May 3, 2006, he arrived at the scene of the crime, 320 Upland Street in River Ridge, and conducted several interviews with various witnesses.
Detective Rodrigue spoke first to Ruth Keys, who was at her mother’s house across the street from where the crime occurred. Keys testified she saw two people exit a vehicle and chase the victim around the back of a house located at 320 Upland, then she heard several gunshots. Keys described the vehicle as a maroon-colored four-door vehicle, with the last three digits of the license plate bearing numbers “198.” She described the driver of the vehicle as a male in his twenties, approximately six feet tall, with his hair in short “twists” (dreadlocks), wearing a white t-shirt. She said the passenger of *1102 the vehicle was older than the driver, short and stocky, wearing a white t-shirt and holding a handgun.
Detective Rodrigue said he was unable to locate any suspects or a red vehicle matching the descriptions provided at that time. After concluding the on-scene investigation, Detective Rodrigue returned to the detective bureau, where he received several back-to-back phone calls from anonymous callers who provided information about the homicide on Upland Street.
The first caller stated that the person responsible for the homicide was an individual by the name of “Duck.” The two subsequent calls, which sounded as if |4they were from the same person as the first call, informed the detective that the vehicle involved in the shooting was a red Honda Accord.[1]
Upon learning this information, Detective Rodrigue conducted a computer records check, which revealed that a man by the name of Mack Bradley (the defendant) used the nickname “Duck,” and had listed a former address of 525 Richard Street, located approximately one block from the homicide. According to Detective Ro-drigue, the defendant also fit the physical description of the vehicle’s passenger provided by eyewitness Keys.
The day after the murder, Detective Ro-drigue and Sergeant Eddie Klein met with Keys at her home and presented her with a six-person photographic lineup compiled using the AFIS system and containing the defendant’s picture. Detective Rodrigue made a positive in-court identification of the defendant as Mack Bradley, the individual identified as having the nickname “Duck.”
When Keys was presented with the photographic lineup, Detective Rodrigue testified that she cried, became upset, and declined to make an identification. Keys, who lived in the same neighborhood where the homicide occurred, chose not to cooperate any further in the investigation.
Subsequently, Detective Rodrigue obtained a second lead through Deputy Lester Wilson. Deputy Wilson informed Detective Rodrigue he had been approached during his airport detail by a woman who advised him that a female by the name of K.K. might have information about the homicide.[2] Detective Rodrigue met with K.K., who also lived in the same neighborhood as the defendant, approximately 10 or 12 days after the incident. During the interview he learned | ¡¡that she was present at the scene when the homicide occurred. K.K. was shown three photographic lineups, one of which contained the defendant. K.K. appeared “very scared” and refused to make an identification, but informed Detective Rodrigue that the suspect was in one of the lineups. During the interview, K.K. also described the suspect as wearing green clothing on the night of the homicide. On cross-examination, however, Detective Rodrigue testified that Keys had described the suspect’s clothing as a white t-shirt.
Detective Rodrigue testified that three photographic lineups were used because three suspects had been developed during *1103 the course of the investigation: the defendant, Damien Roby, and Chad Samuels. In one anonymous call, Chad Samuels was identified as being with “Duck” at the time of the murder, and in a subsequent anonymous call, Damien Roby was identified as the individual seen with “Duck” at the time of the murder.
During the course of his interview with K.K., Detective Rodrigue learned that another female by the name of A.J. was with K.K. at the time of the homicide, and was also an eyewitness.[3]
Detective Rodrigue met with A.J. and presented her with the same three photographic lineups. Detective Rodrigue testified that A.J. did not recognize anyone in the photographic lineup containing Damien Roby; and that she recognized Chad Sam-uels, who was depicted in one of the other photographic lineups, from the neighborhood. However, she advised Detective Ro-drigue that Chad Samuels was not present on the day of the murder. A.J. made a positive identification of the defendant as the murder suspect. On cross-examination, Detective Rodrigue testified that A.J. was interviewed and made the identification on June 23, 2006, approximately six weeks after the murder.
| P,During her interview, A.J. also identified the vehicle she observed the perpetrators in as silver in color. After speaking with A.J., Detective Rodrigue obtained an arrest warrant for the defendant.
Detective Rodrigue testified that when individuals are presented with a photographic lineup, they are asked whether they recognize any of the individuals in the lineup. If they do, they are then asked where they recognize that person from. Detective Rodrigue testified that he utilized this procedure with A.J. and K.K., and did not tell them that the suspect was in the lineup, did not promise them anything in exchange for their identification, and did not threaten them to make an identification.
On February 15, 2011, a few weeks prior to trial, and five years after the subject murder, K.K. was interviewed for a second time at her mother’s home in River Ridge. She was again presented with a photographic line-up containing the defendant’s picture and this time made a positive identification of the defendant as the suspect responsible for the murder.[4] Detective Rodrigue testified that during his interview with K.K., she told him that she has known the individual identified in the lineup (the defendant) for her entire life, since she lived a block away from him while growing up.
Further, Detective Rodrigue said both K.K. and A.J. told him that they knew the defendant by the nickname “Duck” and that they had seen Duck when the murder occurred, because they were standing across the street from the scene of the crime.
17The next witness was Debra Fultz, who testified that on the day of the shooting she was at her mother’s house located at 309 South Upland Street. Fultz testified *1104 that she was standing in her mother’s living room when she heard gunshots coming “from down the street.” When she proceeded outside to tell her father to come inside the house, she observed a red four-door vehicle stopped just “past” her mother’s driveway. While standing in the doorway of the house, she also observed a tall, slender young black man running down the street. Fultz then observed a second man, who was older, short, dark-skinned, “stocky and with broad shoulders,” walking down the street holding a gun, as the younger thinner man stated “come on man, come on man.” Fultz testified that the “short, dark-skinned” man appeared to be in his late thirties or very early forties.
Fultz testified she then observed both men enter the vehicle and leave. Fultz testified she was able to see clearly the men’s “color and height” because they were located directly across the street from her mother’s house. She did not provide the descriptive information to the police, however, because she was afraid.
Fultz’s sister, Ruth Keys, also testified that on the day of the shooting she was at her mother’s house on Upland Street when she heard shots coming from across the street. Keys testified that when she heard the shots, she looked out of her mother’s living room window where she saw two men “coming from across the street.” The first man she saw was tall, thin, had “brown skin and was moving kind of fast,” and was holding a gun. Keys described the second man as older than the first man, “short, thick and dark,” holding a gun and “taking his time” to get back to the car. Keys testified that the vehicle the men got into was parked next to her mother’s driveway. Keys described the vehicle’s color as “in the red family.” Keys further testified that she met with Detective Rodrigue after the incident and was Isshown a photographic line-up, but was unable to “pick out a face” because there were “so many of them.”
A.J., who was 17 at the time of the trial, testified that on the day of the shooting she was with K.K. at the sweet shop on Upland Street. She saw two men exit a car and chase the victim behind a house located across from the sweet shop. A.J. testified that she heard gunshots and saw the defendant, whom she described as short with a “fay,” come out from behind the house. A.J. further testified that she made a positive identification of the defendant from a photographic line-up shown to her by Detective Rodrigue. A.J. also made a positive in-court identification of the defendant.
On cross-examination, A.J. testified that the defendant got into a silver car, which was close to the house where the victim was shot. A.J. further testified that she had seen the defendant around the neighborhood before, and that the defendant was also known by the nickname “Duck.”
K.K., who was also 17 at the time of the trial, testified that on the day of the shooting, she was with her friend A.J. at the sweet shop on Upland Street when she heard gunshots being fired from across the street. K.K. testified that she then saw a man come out from behind the house where she had heard the gunshots. K.K. testified further that she was interviewed in connection with the incident and was shown a photographic line-up by Detective Rodrigue. K.K. explained that when she was first interviewed she told the detectives that the person she saw on the day of the shooting was in the photographic lineup, but she did not want to identify him. K.K. also testified that she knew the person in the photographic line-up from the neighborhood but did not want to identify him because she was told not to, and because “people in my neighborhood say you don’t supposed to do stuff like that.”
*1105 | ¡)K.K. testified that the second time she met with Detective Rodrigue, she identified the defendant from the photographic line-up as the person coming out from behind the house on the day of the shooting. K.K. further testified that on the day of the shooting, the defendant looked at her and put his finger to his mouth, indicating to her to “be quiet,” and that she “better not say nothing.”
Lastly, K.K. testified that she had seen the defendant in the neighborhood before, and then made a positive in-court identification of the defendant as the individual she identified from the photographic lineup and the person she had seen come out from the behind the house and make a silencing gesture towards her.
ASSIGNMENT OF ERROR
In his sole assignment of error, the defendant asserts that the trial court improperly denied his motion to suppress the identification because the photographic lineup was overly suggestive, in that his picture was placed in the center of the page and gave a closer view of the defendant’s face than the other pictures. The defendant also asserts that the witnesses who identified the defendant in the photographic line-up were pressured or coerced into selecting his photograph by family members and neighbors.
In response, the State argues that the defendant has failed to prove that the photographic line-up was suggestive or that there was a substantial likelihood of mis-identification as a result of the photographic identification procedure. The State contends that while the defendant’s face is slightly larger than the other suspects depicted, the photographs of all six men were taken from various distances. Moreover, the photographic line-up was compiled from the AFIS database to reflect six men of the same race, complexion, hair-style, weight, and substantially similar characteristics. Thus, the State submits, the photographic line-up was not suggestive.
1^Alternatively, should this Court determine that the photographic line-up was suggestive, the State contends that the defendant failed to prove a likelihood of misidentification as a result of the identification procedure based on the testimony of the witnesses presented at trial.
Generally, a defendant has the burden of proof on a motion to suppress an out-of-court identification. State v. Higgins, 03-1980, p. 19 (La.4/1/05), 898 So.2d 1219, 1232, cert, denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). In order to suppress an identification, a defendant must first prove that the identification procedure was suggestive. Higgins, supra.
An identification procedure is considered suggestive if the attention of the witness is unduly focused on the defendant during the procedure. State v. Robinson, 07-832, p. 12 (La.App. 5 Cir. 4/15/08), 984 So.2d 856, 865, writ denied, 08-1086 (La.12/19/08), 996 So.2d 1132, citing State v. Broadway, 96-2659, p. 14 (La.10/19/99), 753 So.2d 801, 812, cert, denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000).
Strict identity of physical characteristics among the persons depicted in the photographic array is not required; however, there must be sufficient resemblance to reasonably test the identification. State v. Thomas, 06-654, p. 5 (LaApp. 5 Cir. 1/16/07), 951 So.2d 372, 377, writ denied, 07-0464 (La.11/21/07), 967 So.2d 1153. This determination is made by examining articulable features of the persons’ pictures such as height, weight, build, hair color, facial hair, skin color and complex *1106 ion, and the shape and size of the nose, eyes, and lips. Id.
Even if an identification process is suggestive, the defendant must also show there was a substantial likelihood of mis-identification as a result of the identification procedure. Higgins, 03-1980 at 19, 898 So.2d at 1238.
|nIt is the likelihood of misidentifi-cation that violates due process, not the mere existence of suggestiveness. State v. Hurd, 05-258, p. 6 (La.App. 5 Cir. 11/29/05), 917 So.2d 567, 570, writ denied, 06-1128 (La.11/17/06), 942 So.2d 530.
Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Thomas, 06-654 at 4-5, 951 So.2d at 377, citing Manson v. Brathwaite, 432 U.S. 98, 113-14, 97 S.Ct. 2243, 2252-53, 53 L.Ed.2d 140 (1977).
Under Manson v. Brathwaite, the factors that courts must examine to determine, from the totality of the circumstances, whether the suggestiveness presents a substantial likelihood of mis-identification include: (1) the witness’ opportunity to view the criminal at the time of the crime, (2) the witness’ degree of attention, (3) the accuracy of the prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. Any corrupting effect of a suggestive identification procedure is to be weighed against these factors. Manson, supra; Higgins, 03-1980 at 19-20, 898 So.2d at 1233; and State v. Martin, 595 So.2d 592, 595 (La.1992).
However, in the absence of the defendant proving the suggestiveness of the out-of-court identification, a Manson analysis is not necessary. See State v. Medford, 489 So.2d 957, 961 (La.App. 5 Cir.1986); State v. Hensley, 544 So.2d 47, 48 (La.App. 5 Cir.1989). See also State v. Pizzo, 575 So.2d 844, 847 (La.App. 5 Cir. 1991) (where this Court recognized that it need not conduct an inquiry under Manson because the lineup was not constitutionally infirm). The Manson factors are relevant only upon a showing that the identification procedure itself was suggestive. “In the absence of such a showing ... challenges to the witness’ h ¿powers of observation do not raise constitutional issues, but are matters to be considered by the jury.” Medford, 489 So.2d at 962.
In evaluating the defendant’s argument, the reviewing court may consider all pertinent evidence adduced at the trial, as well as at the hearing on the motion to suppress the identification. State v. Clennon, 98-1370, p. 6 (La.App. 5 Cir. 6/30/99), 738 So.2d 161, 164. A trial court’s determination of the admissibility of an identification should be accorded great weight and will not be disturbed on appeal unless the evidence reveals an abuse of discretion. Id.
Here, the defendant contends that the identification was unduly suggestive because his face appears larger in the photographic line-up than the other five faces depicted.
In State v. Johnson, 00-680 (La.App. 1 Cir. 12/22/00), 775 So.2d 670, writ denied, 02-1368 (La.5/30/03), 845 So.2d 1066, the court rejected the defendant’s claim that the photographic lineup was suggestive because his head was larger and the photograph was brighter than any of the other photographs. After examining the six-picture photo array, the court observed that the pictures were all the same size. The court noted that defendant’s photograph was on the bottom row. Although his head was larger than the other two pic *1107 tures on the bottom row, his head was the same size as the three pictures on the top row. The court stated that the differences in the sizes of the heads was explained by the fact the pictures of defendant and the three men on the top row showed only the head and neck for each man and were more of a close-up view than the other two pictures, which included the upper shoulders for those two men. Further, the court observed that the officers used a computer to select the photographs of men with similar characteristics. Even though defendant’s photograph was slightly brighter, the court found that it was not noticeably different in skin color. After examining the | ^array and considering the preparation of the lineup and the manner in which it was conducted, the court found that it was not suggestive. Id.
In State v. Bartley, 03-1382 (La.App. 5 Cir. 3/30/04), 871 So.2d 563, writ denied, 2004-1055 (La.10/1/04), 883 So.2d 1006, relied on by the State in its brief, this Court found no merit to the defendant’s argument that the identification was unduly suggestive because the defendant’s face appeared larger than the other men. We analyzed the photographic line-up and determined that the difference in photographs was not suggestive. Specifically, we noted that the defendant’s photograph, located in the middle of the top row, was similar in age, weight, skin color, hairstyle and facial features to the other men in the line-up. Moreover, we found, all of the photographs were the same size, and although the defendant’s head was slightly larger than that of the other men, as in Johnson, we concluded that the difference was attributable to the fact that the photograph was taken closer than the surrounding photographs. In addition, we held that there was not a substantial likelihood for misidentifieation. Both the suppression hearing and trial testimony established that the witness had ample time to view the suspect, and the immediate identification of the defendant from the line-up was made shortly after the incident.
In the instant case, we do not find that the photographic line-up was suggestive. The photographic array presented to K.K. and A.J. in this case reflects that the defendant’s photograph is positioned in the middle of the bottom row. All of the photographs depict black men of similar age, weight, skin color, hairstyle and facial features. All of the pictures are the same size, but the defendant’s head appears larger than the heads of the other men. As in Johnson and Bartley, supra, however, this difference is attributable to the fact that the photograph was taken at a closer distance than the other photographs. Moreover, a review of the | i4photographs displayed in the line-up indicates that the photographs of the men vary in distance, with the pictures taken at the closest range placed next to each other.
Although the defendant argues that his picture was specifically “cropped to cause the witness to examine his picture more closely than the other five men,” the testimony of Detective Rodrigue at the suppression hearing indicates that the defendant’s photograph was taken from the AFIS database.
In State v. Thomas, 06-654, p. 6 (La. App. 5 Cir. 1/16/07), 951 So.2d 372, 377, writ denied, 07-464 (La.11/21/07), 967 So.2d 1153, this Court found that although the subjects’ mustaches varied in thickness, the photographic lineup did not unduly focus attention on defendant. We noted that it consisted of six photographs of African-American men with similar hairstyles and facial features, that the backgrounds of the photographs were similar, and that three of the men (including *1108 the defendant) were shown wearing white t-shirts.
We find that the lineup did not unduly focus attention on defendant and was not suggestive. In the absence of showing a procedure is suggestive, no further analysis is required. State v. Lathers, 09-20, p. 11 (La.App. 5 Cir. 5/26/09), 15 So.Bd 1068, 1075, writ denied, 2009-1341 (La.2/12/10), 27 So.3d 841.
Accordingly, we find no merit to this assignment.
ERROR PATENT DISCUSSION
The record was reviewed for errors patent, pursuant to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). We find the following error, which we correct in this opinion:
Although the commitment reflects that defendant was given a proper advisal of the time period for seeking post-conviction relief, the transcript reflects an incomplete advisal. The transcript reflects the defendant was advised that he had “two years in which to file post conviction relief.”
11sWhen there is a discrepancy between the commitment and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983).
This Court has held that the failure to advise a defendant that the prescriptive period runs from the time his conviction and sentence become final is an incomplete advisal. State v. Grant, 04-341, p. 5 (La. App. 5 Cir. 10/26/04), 887 So.2d 596, 598.
In the past, this Court has ordered the trial court to properly advise the defendant of the prescriptive period under La. C.Cr.P. art. 930.8 by written notice within ten days of the rendition of this Court’s opinion and then to file written proof in the record that the defendant received the notice. Recently, however, this Court has begun correcting this type of error patent by way of its opinion. See State v. Neely, 08-707, p. 9 (LaApp. 5 Cir. 12/16/08), 3 So.3d 532, 538, writ denied, 09-0248 (La.10/30/09), 21 So.3d 272; State v. Davenport, 08-463, pp. 10-11 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 451, writ denied, 09-0158 (La.10/16/09), 19 So.3d 473. Accordingly, we shall include the appropriate advice in the decree here.
DECREE
For the foregoing reasons, the conviction and sentence are affirmed. The defendant is advised that no application for post-conviction relief shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.

CONVICTION AND SENTENCE AFFIRMED

. The red Honda Accord belonged to an individual by the name of Chad Samuels. When the officers went to Samuels' home approximately two months after the shooting, they located the subject vehicle and Samuels, who fit the description of the driver in every respect except for his hair, which had been shaved so that he was bald.

. At the time of the interview, K.K. was 13 years old. Pursuant to La. R.S. 46:1844, in order to protect her identity and provide for the safety and welfare of juvenile eyewitnesses to a crime, we will refer to K.K. by initials only.

. At the time of the interview, A.J. was 13 years old. As with K.K., we identify A.J. only by her initials, in order to protect her identity and provide for her safety and welfare, pursuant to La. R.S. 46:1844.

. At the suppression hearing, on cross-examination, Detective Rodrigue testified that both eyewitnesses were shown three photographic lineups in 2006 because there were three suspects that had been developed at that time. However, because no identifications or evidence concerning the two other suspects were obtained during the course of the investigation, K.K. was only shown one photographic lineup containing the defendant's picture when she was interviewed for a second time in 2011.