STATE OF LOUISIANA

VERSUS

TORUS H. WALLACE AKA "T-MAN"

NO. 22-KA-597

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 20-3976, DIVISION "F"
HONORABLE MICHAEL P. MENTZ, JUDGE PRESIDING

August 09, 2023

**STEPHEN J. WINDHORST**
**JUDGE**

Panel composed of Judges Stephen J. Windhorst,
Cornelius E. Regan, Pro Tempore, and Jason Verdigets, Pro Tempore

**CONVICTIONS AND SENTENCES AFFIRMED; REMANDED WITH INSTRUCTIONS**
    **SJW**
    **CER**
    **JMV**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Alexis Barteet
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
 Honorable Paul D. Connick, Jr.
 Thomas J. Butler
 Darren A. Allemand
 Thomas P. Sanderson
 John Ransone IV

COUNSEL FOR DEFENDANT/APPELLANT,
TORUS H. WALLACE
 Bertha M. Hillman

**WINDHORST, J.**

Defendant, Torus H. Wallace (a/k/a "T-Man"), appeals his convictions and sentences for manslaughter and obstruction of justice. For the reasons stated herein, we affirm defendant's convictions and sentences, and remand with instructions.

**PROCEDURAL HISTORY**

On July 30, 2020, a Jefferson Parish Grand Jury returned an indictment charging defendant with the second degree murder of Rene Rachel in violation of La. R.S. 14:30.1 (count one), and obstruction of justice in violation of La. R.S. 14:130.1 (count two).[1] Defendant was arraigned and pled not guilty.

Defendant filed a motion to suppress identification, arguing that the photographic lineup used to identify him was suggestive and the identification was unreliable. Defendant also contended that the identification made via the "Wanted Bulletin" ("the bulletin") issued by the Jefferson Parish Sheriff's Office ("JPSO") was suggestive. After an evidentiary hearing, the trial court denied defendant's motion to suppress identification as to the six-person photographic lineup and the bulletin.

On May 10, 2022, a twelve-person jury unanimously found defendant guilty of the responsive verdict of manslaughter to count one, and guilty of obstruction of justice on count two. Defendant filed a motion for new trial and motion for post-verdict judgment of acquittal, which were denied by the trial court. On June 28, 2022, the trial court sentenced defendant to 40 years imprisonment at hard labor without the benefit of probation or suspension of sentence on count one, and 20 years imprisonment on count two, with the sentences to run concurrently.[2]

---

[1] Count two states that defendant violated La. R.S. 14:130.1 in that "he did obstruct justice by tampering with evidence, to wit removing the .45 caliber handgun from the scene of a second degree murder when this action was committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding."

[2] The trial court ordered defendant's sentences to also run concurrently with any other sentence he may be serving. The trial court further designated the conviction for count one as a crime of violence and assessed defendant a $750.00 crime lab fee as to count two.

On June 28, 2022, the State filed a Habitual Offender Bill of Information alleging defendant was a second felony offender as to count one. After a hearing, the trial court adjudicated defendant a second felony offender. The trial court vacated defendant's original sentence on count one and resentenced defendant to 80 years imprisonment without the benefit of probation or suspension of sentence. The trial court ordered the enhanced sentence to run concurrent with count two and any other sentence defendant may be serving. Defendant filed a motion to reconsider sentence, which the trial court denied. This appeal followed.

**EVIDENCE and FACTS**

The testimony and evidence at trial revealed the following. On March 29, 2020, Alvin Rachel picked up his brother/the victim, Rene Rachel, in his mother's Silver Saturn Vue.[3] Rene sat in the passenger seat. Alvin testified that they drove to "Elm Street"[4] to buy "mojo" from "Queen," also known as "Q."[5] Alvin stated that he went to the Elm Street area "a couple times a week," and that Rene was with him most of the time.

Alvin testified that on the way to Elm Street, they picked up Q's boyfriend, Huey, "right by Market and Elm." When they arrived at the location on Elm Street, Alvin pulled over and Huey went inside to buy the mojo for them.[6] While they were waiting for Huey to return, Rene's window was down and defendant approached on a bike. Defendant and Rene exchanged words "about money that was owed." Alvin acknowledged that he did not see defendant approach on the bike because he was

---

[3] Alvin testified that Rene also frequently drove their mother's Saturn Vue and would use the vehicle to buy drugs on Elm Street.

[4] Although Alvin refers to the street as "Elm Street" throughout his testimony, the trial testimony and evidence shows that the street's correct name is "North Elm Street."

[5] Alvin testified that Rene suffered with substance abuse and mental issues and that although Rene attempted to obtain treatment, he was unsuccessful. Alvin testified that prior to Rene's death, he only "smoked a little Mojo" but after Rene's death, he developed a drug addiction. Alvin testified that he received treatment and he was no longer an addict.

[6] Alvin testified that it was "on Elm Street . . . if you [were] coming from Market Street, it would be about, maybe, about a block and a half down the street right before Versailles. . . [n]ext to the Full Gospel of Jesus."

cleaning a "pipe," but he heard defendant and Rene talking. He stated that he did not "*per se* hear any threats," but he heard Rene state "something like I got you tomorrow" and defendant replied "all right." Alvin testified that defendant got off of his bike and "within a matter [of] five seconds" he heard a gunshot. He said that his "ear was ringing" and he looked over and saw that his brother was shot. He testified that at the time, although he did not know defendant's name, he had previously seen him on Elm Street in "different locations."[7]

Alvin testified that he immediately left the area and drove down the street. Because his brother's phone was locked, Alvin stated that he stopped an individual on the street and asked to use his phone. The individual, later identified as Jonathon Glickman,[8] got into the car and Alvin called 911. Alvin testified that he parked in the CVS parking lot and he and the individual attempted to render aid to his brother. Alvin testified that he ripped off his shirt and used it to try and stop his brother's bleeding. He also called his mom to let her know what happened and then the police arrived. After the ambulance arrived, he told a detective what happened and was placed in the back of a car. He subsequently left and went to the "Detective Bureau on Maple Street," where he spoke to Detective Anthony Buttone.

Alvin testified that although he was not able to give the police the individual's name who shot his brother, he provided a description of him to the police. He stated that he had previously seen the individual on Elm Street. Alvin testified that it was light enough outside and he saw the person who shot his brother, and that he was the same person who approached their vehicle. He identified defendant in open court as the individual who approached their vehicle and shot his brother. He stated that his brother appeared to know defendant fairly well and that he previously witnessed

---

[7] When asked if he was "sure" that he had previously seen defendant, Alvin testified "Absolutely."

[8] In the trial transcript, Mr. Glickman was referred to as a "Good Samaritan bystander" because the police learned he had no connection to the case other than lending Alvin his phone and helping render aid to the victim.

his brother dealing with defendant in the past. Alvin stated that "one other time before when [defendant] came up and he asked my brother the same question." Alvin testified that he asked Rene defendant's name and Rene said "T-Man," and that he owed "the guy some money, or whatever, but it was not issue to worry about."

While at the bureau, he was shown a six-person lineup. Alvin immediately identified number five, defendant, as the individual who shot his brother. He testified that he got a good look at defendant after he shot his brother. He stated he was "100%" positive in his identification of defendant. Alvin testified that defendant looked at him after he shot his brother and that he would "never forget the face." He stated defendant "had the look basically like, yeah, I just shot your brother, what you're [*sic*] going to do about it." He testified that the gun used to kill his brother had a silver top and a black bottom and it was a "40 or 45." He testified that the gun barrel was "probably less than a foot away . . . a foot and a half at most" from the window. The barrel of the gun was not in the window and defendant did not touch the vehicle.

Deputy Matthew Veazey testified that on March 29, 2020, he was dispatched to the CVS Pharmacy located at 101 David Drive, in reference to an aggravated battery by shooting. Upon arrival, he observed a white male without a shirt on, subsequently identified as Alvin Rachel, standing in front of a vehicle in the parking lot. Alvin was "flagging [him] down screaming that his brother had been shot, he needed an ambulance." Another male, Mr. Glickman, was in the front passenger side of the vehicle attempting to apply pressure to the victim's chest. He testified that the victim subsequently died of his injuries.

Deputy Veazey stated that Alvin informed him that he and his brother Rene drove to the 500 block of North Elm, referred to as "the Cut," to buy mojo. Alvin told him that while they were in that area, a male wearing a white shirt and dark basketball shorts approached his vehicle and asked if he wanted to buy crack. When

Alvin responded "no, they don't smoke crack," the male said "you're disrespecting me" and produced a firearm. The male put the firearm through the window and fired one round which struck the victim. Alvin put the vehicle in reverse and headed back towards Airline. Alvin said that he found Mr. Glickman on the corner of Airline and Elm and asked if he could use his phone. Mr. Glickman got into the back of his vehicle and they drove to 101 David Drive where they contacted the police.

Deputy Veazey testified that upon learning that the shooting occurred in the 500 block of North Elm, he advised officers to secure the scene and to look for any more victims, witnesses, and/or suspects. After obtaining information from Alvin and securing the scene at the CVS location, he placed Alvin and Glickman in separate vehicles until someone from the detective bureau arrived. On cross-examination, Deputy Veazey testified that during his brief conversation with Alvin in the parking lot of CVS, Alvin did not mention "any drug debt" or the name "Huey."

Deputy Brian Donegan testified that he was dispatched to the North Elm Street area in the Cut to help locate the scene of the crime and to look for evidence, witnesses, and/or suspects. He stated he was familiar with the area and it was a known area for drugs and high crime. He was unable to find any physical evidence in the area connected to the shooting. Deputy Donegan testified that while canvassing the area, an elderly black woman passed him, avoiding eye contact, and stated "T-Man did it. You didn't hear that from me," and she kept walking. He was unable to get any further information from the woman but he relayed the information to "rank," who subsequently relayed it to the detectives in this case.

Detective Anthony Buttone testified that he was the lead investigator in the homicide of the victim on March 29, 2020. He was notified through dispatch to respond to the CVS located on 101 David Drive. Upon arrival, the victim was still inside the vehicle but EMS had already pronounced him deceased. He stated that he

learned that the victim's brother Alvin was an eyewitness to the homicide. He was informed that Alvin and the victim went to the 500 block of the North Elm area to purchase mojo from "Q" and while in the area they were approached by an individual over an alleged money issue that should have been paid, and that is when the shooting occurred. After the shooting, Alvin drove away and relocated to the CVS.

Detective Buttone testified that they were unable to recover any evidence from the scene of the shooting located around the 500 block of North Elm Street, also known as the Cut. Specifically, the firearm that was used to kill the victim was not recovered and no casings were recovered in the area of the shooting.[9] Evidence was collected from the vehicle where the victim was shot, including DNA swabs from the vehicle in case "the suspect touched the car or the passenger side when speaking to the victim prior to shooting him." Detective Buttone stated that Alvin provided a statement to the police concerning the incident. Additionally, an anonymous source informed the police that "T-Man," subsequently identified as defendant,[10] was responsible for the shooting. As a result, they developed defendant as a suspect in this incident.

Detective Buttone testified that a photographic lineup was shown to Alvin, who identified defendant as the shooter.[11] Detective Buttone testified that he applied for an arrest warrant for defendant and a search warrant for defendant's last known address, 501 North Elm Street.[12] A search warrant for a buccal swab of defendant was also obtained; however, defendant's DNA was not located on anything of

---

[9] Jene Rauch, an expert in the field of firearm identification, testified that she received one unknown caliber copper jacketed projectile. However, the projectile was "badly damaged" and she was only able to determine that it was from a 45 caliber weapon.

[10] Detective Buttone testified that defendant was interviewed in a prior investigation and previously stated that his nickname was "T-Man" and his legal name was Torus Wallace. In the prior investigation, defendant also stated that he frequented the area where the shooting occurred and he resided with his grandmother in "close proximity" to the area, "on "Dilton."

[11] An audio-video recording of Alvin's interview and identification of defendant as the shooter through the photographic lineup was shown to the jury. The photographic lineup and audio-video recording were admitted into evidence without objection.

[12] They subsequently learned that defendant no longer resided at the North Elm Street address.

evidentiary value in this case.[13] Detective Buttone testified that defendant was subsequently arrested at the "correctional center" where he turned himself in.

Detective Buttone testified that on June 24, 2020, Claire Madere, the victim's girlfriend came forward to speak with the police. She identified defendant from a "Wanted Bulletin" of defendant that she saw on social media and signed the back of the bulletin. Detective Buttone testified that he interviewed Ms. Madere and she provided relevant information to his investigation.

Claire Madere testified that in March of 2020, she was living with her boyfriend/the victim, Rene.[14] She stated that she was not with the victim the day he was shot but she was with him a few days prior to the shooting (four days before). "It was like a Thursday." She testified that the victim had picked her up and they drove to Elm Street in his gray Saturn. He pulled into a parking lot and the victim was going to get mojo. She testified that an individual came up to the window and said "you don't have my money. I'm going to kill you both." When asked if she was able to see the individual, she responded, "Not good. But all I know is his hair was black and had curly dread hair." After the individual threatened them, they drove away and went home.

Ms. Madere testified that in June she informed the JPSO about the events that occurred a few days before the shooting when an individual threatened her and Rene. Prior to speaking with the police, Ms. Madere testified that she did tell the victim's mom "and them" about the incident as well. She informed the detective that she saw a photograph of the "guy that killed him" on Facebook, which prompted her to contact the victim's mom. She testified that she was shown the same photograph on the bulletin by the detective when she went to speak with the police. She confirmed that she wrote on the back of the bulletin "This is the person that came to the window.

---

[13] Marcela Zozaya, an expert in the field of forensic DNA analysis, confirmed that defendant's DNA was not present on the vehicle the victim was in when he was shot.

[14] She stated that Rene's mom, his grandmother, his brother Alvin, and two children also lived with them.

[A]sked Rene for money. He told him that he didn't have the money. If you don't have the money next time i [*sic*] will kill you both. Then we left and went home." Ms. Madere confirmed that she was not shown any other photographs of potential suspects other than the bulletin.

Dr. Dana Troxclair, an expert in forensic pathology, testified that she performed an autopsy of the victim and classified his death as a homicide. She testified that the victim's death was caused by a gunshot wound to the chest. Dr. Troxclair testified that the bullet entered the medial right forearm, exited the anterior right forearm, and reentered the right upper chest.[15] Dr. Troxclair testified that the entry and exit wound in the arm and the reentry wound into the chest are consistent with an "individual who's in a seated position who is being shot from above and from the side." She also testified that there was stippling near the victim's wound, which indicated that the gun was close to the victim when he was shot.

**LAW and ANALYSIS**

In his sole assignment of error, defendant contends that the trial court erred in denying the motion to suppress his identification from the six-person photographic lineup. Defendant argues that his photograph was suggestive because it was the only photograph in the lineup depicting a man with a partially shaved head, and the shading in his photograph was lighter than the other photographs.[16] Defendant also asserts that there was a substantial likelihood of misidentification.

Generally, a defendant has the burden of proof on a motion to suppress an out-of-court identification. La. C.Cr.P. art. 703 D; State v. Bradley, 11-1060 (La. App. 5 Cir. 09/25/12), 99 So.3d 1099, 1105, writ denied, 12-2441 (La. 05/03/13), 113

---

[15] The toxicology report showed that the victim had cocaine in his system. The sample was then sent out to be quantitated and it came back with only benzoylecgonine, "so the cocaine wasn't there, the metabolite was." Dr. Troxclair testified that the presence of the metabolite in the victim's system had no bearing as to the cause of death. The victim's death had "nothing to do with a cocaine overdose" and the metabolite did not contribute to the victim's death "at all."

[16] Defendant did not raise any issues concerning the trial court's denial of his motion to suppress identification of defendant by Claire Madere via the bulletin, and it is therefore not before this court.

So.3d 208. In order to suppress an identification, a defendant has the burden of first proving that the identification procedure was suggestive. State v. McQuarter, 19-594 (La. App. 5 Cir. 11/25/20), 305 So.3d 1055, 1073, writ not considered, 21-295 (La. 08/06/21), 322 So.3d 247; State v. Higgins, 03-1980 (La. 04/01/05), 898 So.2d 1219, 1232, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). A photographic lineup is suggestive if the photographs display the defendant in such a manner that the witness' attention is unduly focused on the defendant, or if the individuals in the lineup lack a sufficient resemblance of characteristics and features. State v. Grimes, 09-2 (La. App. 5 Cir. 05/26/09), 16 So.3d 418, 429, writ denied, 09-1517 (La. 03/12/10), 28 So.3d 1023. A strict identity of physical characteristics among the persons depicted in the photographic array is not required; all that is required is a sufficient resemblance to reasonably test the identification. Id. Courts make this determination by examining articulable features of the persons' pictures such as height, weight, build, hair color, facial hair, skin color and complexion, and the shape and size of the nose, eyes, and lips. Bradley, 99 So.3d at 1105-1106.

Even if an identification process is suggestive, the defendant must also show there was a substantial likelihood of misidentification based on the identification procedure. Id. at 1106. Courts examine various factors to determine, from the totality of the circumstances, whether the suggestiveness presents a substantial likelihood of misidentification including: (1) the witness' opportunity to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Manson v. Brathwaite, 432 U.S. 98, 116, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); McQuarter, 305 So.3d at 1073; State v. Honore, 09-313 (La. App. 5 Cir. 01/12/10), 31 So.3d 485, 497. A trial court's determination of the admissibility of an

identification should be accorded great weight and will not be disturbed on appeal unless the evidence reveals an abuse of discretion. McQuarter, 305 at 1073.

We find the photographic lineup was not unduly suggestive. The individuals in the photo array are all African-American males appearing to be around the same age. All of the individuals have a "twist" hairstyle of similar lengths. Additionally, with slight variations, the individuals all have similar facial features, skin tone, and build. Defendant's background has a light tint but so do photograph numbers three and four, while the backgrounds in photograph numbers one, two, and six appear to have a darker tint. However, a fair viewing of the photographs based on background tint does not support the conclusion that the array unduly focused attention on defendant.

Additionally, Alvin, an eyewitness to the shooting, who was sitting by his brother when he was shot, testified that it was light enough outside to see the shooter. He testified that after his brother was shot, he was able to get a "good look at him" and he would "never forget that face." He was able to give the JPSO a description of the shooter, stating that the shooter had some of his "sides shaved, his hair came out and up like twists kind of like a pineapple" and that he was a young guy. He was presented with a six-person photographic lineup within hours of the shooting and immediately identified defendant as the shooter.

Moreover, at the suppression hearing Detective Buttone testified he interviewed Alvin and subsequently presented him with the six-person lineup. Prior to showing the lineup, he read a "victim/witness instruction form" to Alvin. Detective Buttone testified that it was a "blind" lineup. He did not create the lineup, he did not see the lineup prior to presenting it to Alvin, he did not know who was in the lineup, nor did he know the position of defendant in the lineup. He stated that Alvin was not told he would recognize anyone in the lineup, he was actually told the opposite in the instructions. The lineup was presented to Alvin in an unmarked

folder and he left the room while Alvin looked at the lineup. Almost immediately, Alvin knocked on the door and Detective Buttone reentered the room wherein Alvin identified photograph number five of the lineup as the individual who shot his brother. Detective Buttone testified that Alvin was not promised anything to make that identification nor was he coerced in any way to make that identification.

Accordingly, despite any slight variations in the photographs, we find there is sufficient similarity among the individuals depicted in the lineup to reasonably test identity and any slight variation in the photographs did not unduly focus attention on defendant. For these reasons, we find the six-person photographic lineup was not suggestive. See State v. Thompson, 22-497, (La. App. 5 Cir. 1/18/23), 356 So.3d 1185; Grimes, *supra*; State v. Thomas, 06-654 (La. App. 5 Cir. 1/16/07), 951 So.2d 372, 377, writ denied, 07-464 (La. 11/21/07), 967 So.2d 1153; State v. Bright, 98-398 (La. 04/11/00), 776 So.2d 1134, 1145;[17] State v. Smith, 618 So.2d 419, 422 (La. App. 5 Cir. 1993), writ denied, 625 So.2d 1056 (La. 1993); State v. Scott, 490 So.2d 396, 402 (La. App. 5 Cir. 1986).

Even if the lineup was suggestive, considering the factors set forth in Manson, *supra*, we find that there was no substantial likelihood of misidentification under a totality of the circumstances. Defendant asserts that there was a substantial likelihood of misidentification because: 1) Alvin's opportunity to view the shooter was limited; 2) Alvin was not paying attention to the victim and he testified to cleaning out his pipe when the shot was fired; 3) Alvin's prior description of defendant was generic; 4) the shading was lighter in the photograph of defendant and it was the only photograph that depicted a man with a partially shaved head; and

---

[17] The Louisiana Supreme Court ultimately vacated the defendant's conviction and sentence after granting the defendant's post-conviction relief application based on a failure to disclose evidence entitled to defendant under Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 119601197, 10 L.Ed.2d 215 (1963). State v. Bright, 02-2793 (La. 05/25/04), 875 So.2d 37.

5) although the lineup was conducted a few hours after the homicide, the identification was a cross-racial identification. We disagree.

Defendant contends that Alvin's opportunity to view the shooter was limited because the interaction between the shooter and his brother occurred in a "matter of minutes." Defendant also asserts that while Rene was seated in the passenger seat of the vehicle when he was shot, the testimony showed that Alvin had exited the vehicle and he was "standing on the street" when his brother was shot. Upon review of the trial testimony, this is a misstatement of Alvin's testimony. Alvin was presented with a photograph of the crime scene and was asked if he recognized the area. Alvin responded that he recognized the area and was explaining his point of view of where he parked and where the shooting occurred from the vantage point of a corner looking down the street as depicted in the photograph. At no point during the trial did Alvin state he was standing on the street when the shooting occurred. Alvin expressly testified that he was in the driver's seat cleaning a pipe and his brother was in the passenger seat when his brother was shot. Alvin testified that he heard the conversation between his brother and the shooter, he was able to see the shooter's face after his brother was shot, and he would "never forget the face." Additionally, Alvin testified that he previously saw defendant at different locations prior to the shooting. Therefore, the evidence showed that Alvin, an eyewitness to the shooting and who was sitting in the vehicle when his brother was shot in the passenger seat, had sufficient opportunity to view and identify defendant, the shooter.

Defendant also contends Alvin was not paying attention because he was cleaning out his pipe when his brother was shot. Alvin testified although he did not see from which direction defendant approached because he was cleaning out his pipe, defendant did approach their vehicle on a bike. Alvin stated that defendant approached on his bike, he heard him exchange words with his brother about "money

that was owed," and defendant "got off a bike and within a matter of five seconds I heard [a] gunshot." He testified that he looked over and saw his brother was shot. Alvin testified that it was light enough outside to see the shooter, he saw the person who shot his brother, and he would "never forget the face." Based on his testimony at trial, Alvin portrayed a great degree of attention at the time of the incident to reliably identify the shooter.

Next, defendant asserts that Alvin's description of the shooter was generic. He also avers that the shading was lighter in defendant's photograph and defendant's photograph was the only one with a partially shaved head. He argues these factors show that the lineup unduly focused attention on defendant. During his interview, Alvin described the physical characteristics of the shooter to Detective Buttone, stating the shooter had some of his "sides shaved, his hair came out and up like twists kind of like a pineapple" and that he was a young guy. After Detective Buttone left the interview room, Alvin viewed the photographic lineup and knocked for the detective to re-enter the room within seconds. Alvin stated he was one hundred percent sure that number five in the lineup was the shooter. Detective Buttone testified that defendant was in fact the individual in the number five position in the six-person lineup. The photograph of defendant displayed in the photographic lineup appears consistent with the description given by Alvin. Additionally, as previously discussed above, despite slight variations in the photographs, there is sufficient similarity among the individuals depicted in the lineup to reasonably test identity and any slight variation in the photographs did not unduly focus attention on defendant. Thus, Alvin was able to sufficiently provide a reliable description of defendant, the shooter, to the police. Alvin also testified that he was "one hundred percent" positive that defendant was the shooter when he identified him from the lineup.

Defendant further contends that although the lineup was a couple of hours after the shooting, cross-racial identification makes the identification unreliable, citing Gonzales v. Thaler, 643 F.3d 425, 432 (5th Cir. 2011).[18] The testimony showed that the shooting occurred approximately 6:31 P.M., and Alvin's identification of defendant as the shooter happened a few hours later at 9:12 P.M. While it is undisputed that the identification made in the instant case is a cross-racial identification, (Alvin is Caucasian and defendant is African-American) the evidence and testimony outweigh any question as to misidentification.

Defendant also argues that because Detective Buttone testified at the suppression hearing that Alvin had not seen defendant prior to the day of the shooting, Alvin's identification is even more unreliable. A review of the record confirms that Detective Buttone testified that Alvin stated he had not seen defendant before the day of the shooting. However, Alvin consistently testified at trial he previously saw the defendant on Elm Street at different locations while he was with his brother prior to this incident.

Considering the testimony and evidence, we find the identification was reliable and not suggestive. Furthermore, we find under the totality of the circumstances, and applying the Manson factors, that the identification of defendant as the shooter was not suggestive and there was no substantial likelihood of misidentification. Accordingly, we find the trial court did not abuse its discretion in denying the defendant's motion to suppress the identification.

---

[18] Gonzales was a federal habeas relief case in which relief was denied. While denied on other grounds, the court noted the "frailty of eyewitness testimony" in that case, noting that all identifications in that case were cross-racial identifications. Id. at 432.

**ERRORS PATENT REVIEW**

The record was reviewed for errors patent according to the mandates of La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); and State v. Weiland, 556 So.2d 175 (La. App. 5 Cir. 1990). The following require corrective action.

The record shows that defendant was charged with second degree murder in violation of La. R.S. 14:30.1 and was found guilty of the responsive verdict of manslaughter in violation of La. R.S. 14:31. However, the uniform commitment order (UCO) incorrectly states that the defendant was charged with manslaughter on count one. Additionally, the sentencing minute entry and transcript indicate that the enhanced sentence on count one was to be served without the benefit of probation or suspension of sentence, whereas the habitual offender UCO does not show that the enhanced sentence on count one is to be served without benefit of probation or suspension of sentence.

Accordingly, we remand this case to the trial court for correction of the UCO and the habitual offender UCO. See State v. Lyons, 13-564 (La. App. 5 Cir. 0/31/14), 134 So.3d 36, writ denied, 14-481 (La. 11/07/14), 152 So.3d 170 (*citing* State v. Long, 12-184 (La. App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142); State v. Johnson, 19-63 (La. App. 5 Cir. 09/04/19), 279 So.3d 526, 530-531; State v. Ducksworth, 17-35 (La. App. 5 Cir. 12/13/17), 234 So.3d 225, 237. We further direct the Clerk of Court for the 24th Judicial District Court to transmit the corrected UCO and habitual offender UCO to the appropriate authorities and the Department of Corrections' legal department.

**DECREE**

For the foregoing reasons, defendant's convictions and sentences are affirmed and the matter is remanded to the trial court with instructions.

<u>**CONVICTIONS AND SENTENCES AFFIRMED; REMANDED WITH INSTRUCTIONS**</u>

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
CORNELIUS E. REGAN, PRO TEM

JUDGES



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **AUGUST 9, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**22-KA-597**

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE MICHAEL P. MENTZ (DISTRICT JUDGE)
DARREN A. ALLEMAND (APPELLEE)      THOMAS J. BUTLER (APPELLEE)      THOMAS P. SANDERSON (APPELLEE)
BERTHA M. HILLMAN (APPELLANT)

### MAILED
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
JOHN RANSONE IV (APPELLEE)
ASSISTANT DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053